# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 02-3597

YORDANOS MUHUR,

*Petitioner,*

v.

JOHN ASHCROFT, Attorney General of the United States,

*Respondent.*

_____

On Petition to Review an Order of the
Board of Immigration Appeals.

_____

ARGUED DECEMBER 3, 2003—DECIDED JANUARY 20, 2004

_____

Before FLAUM, *Chief Judge*, and POSNER and WILLIAMS,
*Circuit Judges*.

POSNER, *Circuit Judge*.  Yordanos Muhur asks us to set
aside the order that she be removed (deported) from this
country. The order followed the denial of her request for
asylum. She presented evidence intended to establish the
following facts. She was born to a Christian family in Eritrea
in 1974, at a time when it was a province of Ethiopia,
though of course it later became and remains an independ-
ent country. When she was about 17 she moved with her
family to Addis Ababa, the capital of Ethiopia. She became
a Jehovah's Witness in 1992. Five years later she married a
Muslim Ethiopian who converted to the Jehovah's Witness
faith to marry her, and they were married in the Kingdom
Hall (the name the Witnesses give to their house of worship)

in Addis Ababa. Her husband's family strongly disapproved of his marrying a Jehovah's Witness.

He had business dealings in Saudi Arabia and moved there with her shortly after their marriage. His being a Jehovah's Witness in Saudi Arabia was awkward—to say the least, since under Islamic law it is a capital offense for a Muslim to convert to another religion. So he resumed Islam and browbeat his wife to abandon her faith and behave like a Muslim wife. Instead of bowing to his wishes she came to the United States on a visitor's visa (her family had already immigrated to this country) and once here applied for asylum.

According to evidence that the immigration service has not challenged, Eritrea persecutes Jehovah's Witnesses. U.S. Dept. of State, Bureau of Democracy, Human Rights & Labor, *Eritrea: International Religious Freedom Report 2002* (Oct. 7, 2002), http://www.state.gov/g/drl/rls/irf/2002/13820.htm; *International Religious Freedom Report: Jehovah's Witnesses—Eritrea* (2003), http://www.jw-media.org/region/africa_middle_east/eritrea/english/human_rights/e_eritrea_irf2003.htm; International Coalition for Religious Freedom, *Religious Freedom World Report* (June 3, 2002), http://www.religiousfreedom.com/wrpt/africa/eritrea.htm. It is true that in *Tesfu v. Ashcroft*, 322 F.3d 477 (7th Cir. 2003), we upheld a contrary finding by the Board of Immigration Appeals. But we based our ruling on the evidence in that case, and Muhur is not bound by findings of fact made in a case to which she was not a party. The government does not argue that *Tesfu* controls the outcome of this case—it doesn't even cite *Tesfu*.

Ethiopia does not discriminate against Jehovah's Witnesses, and Muhur has Ethiopian citizenship. But in the wake of its recent war with Eritrea, it continues to discrimi-

nate against individuals of Eritrean ethnicity. U.S. Dept. of State, Bureau of Democracy, Human Rights & Labor, *Country Reports on Human Rights Practices-2002: Ethiopia* (Mar. 31, 2003), http://www.state.gov/g/drl/rls/hrrpt/2002/18203pf.htm; "Split by a Pointless War: Despite Peace, Ethiopia's Border with Eritrea Is Still Closed," *The Economist*, Sept. 21, 2002, p. 45. So at any rate the immigration judge noted in this case, as we'll see, though the situation may be improving. U.S. Dept. of State, Bureau of Democracy, Human Rights & Labor, *Ethiopia: Country Reports on Human Rights Practices 2002*, *supra.* Muhur is afraid that if she is returned to Ethiopia she will quickly be deported to Eritrea, where she would not be able to practice her religion openly.

The immigration judge rejected Muhur's claim and ordered her removed to Ethiopia, or, if Ethiopia won't take her, to Eritrea, where he believes she would not be persecuted because she is not an "active" Jehovah's Witness or, as he put it elsewhere in his opinion, a "religious zealot." The Board of Immigration Appeals affirmed without opinion.

The government defends the immigration judge's decision on the ground that he found that Muhur is not a Jehovah's Witness. If that were so and the finding were supported by substantial evidence, her case for asylum would collapse, because as near as we can make out she is complaining of discrimination by Ethiopia against ethnic Eritreans only insofar as it will result in her being sent back to Eritrea, either because Ethiopia will not take her back or if it does will promptly deport her to Eritrea. Nor has she shown that such discrimination would amount to persecution. No matter; all that is relevant is that the removal order is likely to cause her to end up in Eritrea, which persecutes Jehovah's Witnesses.

The immigration judge did not make a finding that Muhur's claim to be a Jehovah's Witness is a fabrication, although a note of skepticism sounds throughout his opinion. He pointed out that an "asylum officer" of the immigration service, who first interviewed Muhur, thought she had fabricated her claim to be a Jehovah's Witness because she couldn't answer the officer's questions "concerning the founder of the Jehovah's Witness faith and the days of religious celebration." But the government acknowledged at the hearing that the asylum officer's opinion was not evidence, because she did not testify or submit an affidavit. The immigration judge concluded that Muhur was not an "active, visible" adherent to the Jehovah's Witness faith, because she presented "very little documentary evidence," "only indicated that she prays with friends and occasionally attends a particular prayer place," and "presented no evidence from a leader of the Jehovah's Witness faith that was able to identify [her] as a member of the faith." She submitted an identification card that a friend had obtained for her in Ethiopia indicating that she was a Jehovah's Witness, but the card "does not appear to be an official church document." And when the immigration judge himself questioned her concerning her faith, she "did not provide great detail."

So he declined to find that Muhur is a Jehovah's Witness, but neither did he find that she is not. He found that Ethiopia does not persecute Jehovah's Witnesses but he did not discuss the likelihood that the Ethiopian government would allow Muhur to remain in Ethiopia, rather than shipping her off to Eritrea, or that it would allow her to return to Ethiopia from the United States, even though he acknowledged "that the Ethiopian authorities are arbitrarily deporting native Eritreans." If she were forced to return to Eritrea, the immigration judge did not think that she would

face a real danger of being persecuted because she "has never been persecuted in the past. [She] has never had a license revoked, has never been dismissed from a civil service position, and has never been denied employment or housing." He seems to have forgotten that Muhur had left Eritrea years before she became a Jehovah's Witness. And to think she might have held a civil service position in Eritrea he must also have forgotten her age. Finally, because he did "not believe that [Muhur] is an active, practicing member of the Jehovah's Witness faith," he did not "believe that she would come to the attention of the authorities in Eritrea, or that she would attract undue notoriety to herself. [She] certainly is not a religious zealot, and I do not believe that she would unreasonably draw attention to herself or her purported religion."

One can question the weight that the asylum officer and the immigration judge placed on ignorance of the details of religious doctrine, absence of official church documents, and lack of acquaintance with a church leader as evidence that an individual is not a true believer. It is *some* evidence, given the incentive of aliens who can remain in the United States only if they are granted asylum to claim membership in a persecuted group and swear falsely in support of the claim. Yet how many Roman Catholics know who founded the Catholic Church, or when, or have an identification card issued by the Church, or are personally acquainted with a Church "leader"? And although the Jehovah's Witnesses are not acephalous, the Catholic Church has a good deal more structure; the Witnesses don't even distinguish between laity and clergy.

But the fatal flaw in the immigration judge's opinion lies elsewhere, not in the weight he accorded to the lack of documentary proof of Muhur's being a Jehovah's Witness but in the assumption—a clear error of law—that one is not

entitled to claim asylum on the basis of religious persecu-
tion if (a big if, by the way, *Najafi v. INS*, 104 F.3d 943, 949
(7th Cir. 1997); *Bastanipour v. INS*, 980 F.2d 1129, 1132-33
(7th Cir. 1992)) one can escape the notice of the persecutors
by concealing one's religion. Christians living in the Roman
Empire before Constantine made Christianity the empire's
official religion faced little risk of being thrown to the lions
if they practiced their religion in secret; it doesn't follow
that Rome did not persecute Christians, or that a Christian
who failed to conceal his faith would be acting "unreason-
ably." ("I do not believe that she would unreasonably draw
attention to herself or her purported religion.") One aim
of persecuting a religion is to drive its adherents under-
ground in the hope that their beliefs will not infect the
remaining population.

The immigration service may be overworked because
of additional duties placed on it in the aftermath of the
September 11, 2001, terrorist attacks on the United States.
But the service does not suggest that the kind of analytical
error that we have just identified is justified, or should be
excused, by a lack of resources. Such a suggestion would
invite the service to try to dilute judicial review by asking
for less money from Congress for adjudication, in the hope
that courts would be forgiving of errors precipitated by the
agency's financial inability to hire the number of competent
adjudicative officers needed to handle the workload without
constantly committing errors.

To conclude, if Muhur is indeed a Jehovah's Witness,
albeit not a fanatical one, she is entitled to asylum if the
denial of asylum will land her back in Eritrea, because she
has a well-founded fear of being persecuted by the Eritrean
authorities unless she abandons or successfully conceals her
religion. It's not as if she *wants* to practice her religion in
secret. Compare *Keo v. Ascroft*, 341 F.3d 57, 60-61 (1st Cir.

2003). In this country she prays with friends and occasionally attends services at a Kingdom Hall; she could not do that in Eritrea without courting persecution.

Whether Muhur *is* a Jehovah's Witness remains undetermined and is an issue to be resolved on remand free of the confusion injected by the immigration judge's analysis of the issue. And since it is possible that Ethiopia will take Muhur back and not deport her, in which event the issue of religious persecution will drop out of the case because as we said Ethiopia does not persecute Jehovah's Witnesses and Muhur has not shown that it will persecute her because of her Eritrean ethnicity, the question where she will end up if she is ordered removed to Ethopia will also be an issue on remand if she is determined to be a Jehovah's Witness.

The petition for review is granted, the order of the immigration service is reversed, and the matter is remanded to the service for further proceedings consistent with this opinion. In view of the mishandling of Muhur's claim by the immigration judge, we urge that the case be assigned to a different immigration judge. *Bace v. Ashcroft*, No. 02-3909, 2003 WL 22966238, at *8 (7th Cir. Dec. 18, 2003); *Georgis v. Ashcroft*, 328 F.3d 962, 970 (7th Cir. 2003); *Kerciku v. INS*, 314 F.3d 913, 919 (7th Cir. 2003) (per curiam).

A true Copy:

      Teste:

                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*