# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 03-1392, 03-2166

IVAN GUCHSHENKOV,

*Petitioner,*

and

KALIN DIMITROV and ZDRAVKA DIMITROVA,

*Petitioners,*

*v.*

JOHN ASHCROFT, Attorney General of the United States,

*Respondent.*

_____

Petitions for Review of Orders of
the Board of Immigration Appeals.
Nos. A73-427-543, A73-427-544, A76-023-111.

_____

ARGUED MARCH 3, 2004—DECIDED APRIL 29, 2004

_____

Before POSNER, ROVNER, and EVANS, *Circuit Judges.*

POSNER, *Circuit Judge.* We have consolidated for decision two petitions to review decisions by the Board of Immigration Appeals denying asylum. The petitions reflect the continuing difficulty that the board and the immigration judges are having in giving reasoned explanations for their decisions to deny asylum. See, e.g., *Niam v. Ashcroft*, 354 F.3d 652, 653-54 (7th Cir. 2004), and cases cited there, plus

such subsequent decisions as *Muhur v. Ashcroft*, 355 F.3d 958 (7th Cir. 2004); *Kourski v. Ashcroft*, 355 F.3d 1038 (7th Cir. 2004), and *Mengistu v. Ashcroft*, 355 F.3d 1044 (7th Cir. 2004).

Guchshenkov, with whom we begin, testified as follows. He is a citizen of Kazakhstan, formerly part of the Soviet Union but now an independent nation with a Kazakh majority which controls the new nation and a Russian minority to which Guchshenkov belongs. There is great enmity between the two groups, in part because of religious differences—the Kazakhs are Muslims, the Russians Christian—and in part because in the Soviet era the Russians were the top dogs and the roles have now been reversed. Guchshenkov married a Kazakh woman, and this provoked three nighttime attacks on him by Kazakh thugs. The first occurred the night of his wedding. The thugs beat him and told him he should leave the country because he was "not supposed to marry somebody from [a] different nationality." He complained to the police (all of whom are Kazakhs), but they told him that "these things happen every day. We have more important things to take care of." In the next attack, a year later, the thugs asked Guchshenkov "what are you doing here with your Russian faith," reminded him that his wife was of a different faith, and told him to "get out of here." They beat and stabbed him. He was afraid to complain to the police.

The third attack was the worst. The attackers told him "we warned you, you knew it, and now your time has come"; "you don't belong here, it's not your place, and you're just spoiling our blood." He was hospitalized with a lacerated liver, and his gall bladder had to be removed. While he was in the hospital, his father went to the police station to file a complaint on his son's behalf and was turned away on the ground that he was not the victim. Released from the hospital after two weeks, Guchshenkov went to the police

station—indeed went seven times, never receiving satisfaction, although on one occasion the police gave him a photo album of criminals to look through. A year after the attack, the police wrote Guchshenkov that his case was "lost from the archive," that they had no suspects, and that they were overloaded with other cases.

A year after that, Guchshenkov, leaving his wife and two children in Kazakhstan, went to Russia, where he paid someone $1,000 to smuggle him in a Russian ship to the United States. After landing in the U.S. he traveled to Canada and sought asylum there, but was turned down, returned to the U.S., and sought asylum here. (There is nothing in the briefs or record concerning Canada's standards for granting asylum or the basis on which Guchshenkov's application for Canadian asylum was rejected.) The immigration judge rejected Guchshenkov's application for asylum in an oral opinion and ordered him removed (deported) to Kazakhstan. The Board of Immigration Appeals affirmed in a very brief opinion that essentially just summarizes the immigration judge's opinion.

The immigration judge acknowledged that the Kazakh majority, which controls the government of Kazakhstan, is hostile to the Russian minority and that Guchshenkov's description of the attacks was truthful. Much of the opinion is given over to the question whether Guchshenkov was attacked because he is a Russian or because (as he had testified) he is a Russian married to a Kazakh. It is unclear why it should matter, unless he's abandoned his family (we don't know)—in which event it might be critical whether as a Russian not married to a Kazakh he would still face persecution. But in any event the ground on which the immigration judge concluded that the marriage had not been a factor in the beatings makes no sense. It's that if the marriage had been a factor, Guchshenkov's attackers "would know [him]

by name . . ., would call him by name and would most likely say things during these encounters which indicated that they were aware that [he] had married an ethnic Kazakh woman." Guchshenkov had testified that his attackers "did not know him by name, they did not mention his spouse or family." Guchshenkov of course did not know whether they knew his name or not; all he knew was that they hadn't called him by name. They *had* referred to the marriage, contrary to the immigration judge, telling Guchshenkov that he was "not supposed to marry some-body from [a] different nationality." It is impossible to follow the immigration judge's reasoning process.

But because his attackers were private individuals rather than state actors, Guchshenkov was not persecuted within the meaning of the law unless the authorities either con-doned the attacks or are unable to protect him. E.g., *Bace v. Ashcroft*, 352 F.3d 1133, 1138-39 (7th Cir. 2003). The immi-gration judge noted that Guchshenkov had complained to the police, had followed up with a number of subsequent visits, the police had shown him the photo album, they "did take [his] complaint and made attempts to investigate the complaints," and his case "was ultimately closed because it was lost and because the police could not devote more time to the investigation because it was overloaded with cases." On the basis of this summary of the evidence, the immi-gration judge concluded that Guchshenkov had not been persecuted even if the attacks had been motivated by his marriage. But the immigration judge's summary of the evidence is hopelessly incomplete. There is no reference to Guchshenkov's testimony that the police are all Kazakhs (not necessarily the best evidence, but neither contradicted nor disbelieved), that their reaction to his first complaint was that "these things happen every day. We have more important things to take care of," and that his father was turned away by the police after the third assault because he

wasn't the victim of the assault (the victim was in the hospital because of the gravity of his injuries). In light of this evidence, the claim made by the police after the third and most serious assault that they had simply lost Guchshenkov's file required more careful scrutiny than the immigration judge gave it. If Guchshenkov's testimony that we summarized earlier was truthful—and the immigration judge did not suggest that it wasn't—the natural inference is that Guchshenkov could not expect any police protection from a further, and eventually fatal, assault should he be returned to Kazakhstan.

The immigration judge's conclusion that Guchshenkov's "filing of various complaints and visiting the police station numerous times . . . [are] inconsistent with the notion that the government of Kazahkstan had approved of these beatings" manages the difficult trick of being at once truthful and absurd. Guchshenkov's repeated visits to the police station were signs of desperation rather than confidence, cf. *Singh v. INS*, 94 F.3d 1353, 1358 (9th Cir. 1996), and while doubtless the government did not know of the beatings and so could not have approved of them, the question is whether it either can or wants to rein in the police when they deny Russians the elementary protections of the law; Guchshenkov's testimony suggests not, as in *id.*; *Andriasian v. INS*, 180 F.3d 1033, 1036-38 (9th Cir. 1999), and *Surita v. INS*, 95 F.3d 814, 817-19 (9th Cir. 1996).

The Board of Immigration Appeals in its characteristically perfunctory opinion affirming the immigration judge added that Guchshenkov's claim for asylum was further undermined by the fact that his wife and children had remained in Kazakhstan without encountering persecution. But it was Guchshenkov whom the thugs were after. His wife is a Kazakh and, for all we know, his children are being brought up as Muslims. Once he left the country, therefore, there was no reason for his family to be persecuted.

Guchshenkov may or may not have a meritorious claim for asylum. As noted earlier, this may turn on his family status, which the record does not illuminate. All we know at this stage is that the decision denying him asylum was unreasoned.

We move on to the Dimitrovs' claim. They are Bulgarian citizens of Macedonian descent ("Macedonian" in the sense of the people who live in the nation of Macedonia, rather than of the people of the part of Greece known as Macedonia, which gave the world Alexander the Great). Before coming to the United States they belonged to an organization called OM-ILENDEN (also known as UMO-Ilinden or VMRO-Ilinden), which seeks to remind such citizens of their Macedonian ethnicity. According to Mr. Dimitrov's testimony, he was arrested and beaten because he had OM-ILENDEN circulars in his possession, police came to his house and confiscated Macedonian books and records, he was told by the authorities that there is no place for Macedonians in Bulgaria, both he and his wife were fired from their jobs because of their membership in the organization, and for the same reason his brother was imprisoned and beaten and his daughter was expelled from medical school. A letter in the record from a U.S. professor named Robert Hayden, a specialist in the politics of the Balkans, establishes, what should anyway be well known to our immigration authorities, that there is a long history of enmity between Bulgaria and the Macedonian people. (Bulgaria sought to conquer Macedonia during the Balkan Wars and occupied it during both World War I and World War II.) According to Professor Hayden, Bulgaria has steadfastly denied that there is a Macedonian entity and has outlawed OM-ILENDEN, brutally oppressed Bulgarian Macedonians who identify themselves as Macedonians, and would persecute the Dimitrovs if they were returned to Bulgaria.

Just as in the case of Guchshenkov, the record does not compel a conclusion that the Dimitrovs are entitled to asylum but a remand is required because the immigration judge's analysis of their application is unreasoned. She "determined that the respondent is basically credible; however, his testimony is not inherently persuasive." We do not understand what this means. The judge went on to say that "the Bulgarian government, right or wrong, must have determined that the Om-Illinden [*sic*] . . . organization's purpose was contrary to the constitution of Bulgaria and therefore, refused to register such organization." The judge did not reject Dimitrov's testimony that he had been arrested and beaten, but she denied that this was a basis for asylum because "the government of Bulgaria felt that the purpose of the organization was contrary to law . . . . While the beating was unfortunate, if it occurred, the Court is of the opinion that it was police brutality and was not specific to [Dimitrov] personally." She further observed that "Bulgaria is a parliamentary republic ruled by [a] democratically elected government."

There is very deep confusion here. The Nuremberg Laws, which subjected the Jews in Nazi Germany to persecution, were laws, but that doesn't mean that Jews were not persecuted. Persecution normally is undertaken either pursuant to law or by a government that can get away with acting supralegally; private oppression rises to the level of persecution only, as we noted earlier, when the government either condones or is helpless to prevent it. Of the different forms of persecution, that which is expressly authorized by the nation's laws is the one most likely to be carried out systematically. See *Bucur v. INS*, 109 F.3d 399, 403 (7th Cir. 1997); *Li Wu Lin v. INS*, 238 F.3d 239, 244 (3d Cir. 2001). What is true is that prosecution for activities that would be illegal under our own laws is not grounds for asylum; so if the Dimitrovs had committed theft or assassi-

nation or other violence, or had fomented rebellion or civil war, and faced punishment for such acts if they were returned to Bulgaria, they could not contend that such punishment would be persecution within the meaning of our asylum law. *Sharif v. INS*, 87 F.3d 932, 935 (7th Cir. 1996); *Lukwago v. Ashcroft*, 329 F.3d 157, 168-69 (3d Cir. 2003); *Chanco v. INS*, 82 F.3d 298, 302 (9th Cir. 1996). But there is no indication that they did anything beyond associating with an organization concerned with preserving their ethnic identity, which Bulgaria seeks to extirpate. If that is all they did—it is all the record indicates they did—the response of the Bulgarian government is the equivalent of our government's suppressing the Knights of Columbus or the St. Patrick's Day parade. Cf. *Singh v. Ilchert*, 63 F.3d 1501, 1508 (9th Cir. 1995); *Perkovic v. INS*, 33 F.3d 615, 622 (6th Cir. 1994) ("Yugoslavia outlaws and punishes peaceful expression of dissenting political opinion, the mere possession of Albanian cultural artifacts, the exercise of citizens' rights to petition their government, and the association of individuals in political groups with objectives of which the government does not approve. Although international law allows sovereign countries to protect themselves from criminals and revolutionaries, it does not permit the prohibition and punishment of peaceful political expression and activity, the very sort of conduct in which the petitioners engaged here"). The fact that a democratically elected government might persecute a minority is not a paradox, since democracy implies majority rule.

The immigration judge doubted that the arrest and dis-employment of Dimitrov were severe enough measures to amount to persecution, but she failed to mention either the measures taken against Dimitrov's wife and daughter or the evidence of Professor Hayden. Her analysis fell far below the minimum required to support an administrative

decision. It is one more indication of systemic failure by the judicial officers of the immigration service to provide reasoned analysis for the denial of applications for asylum. We are mindful that immigration judges, and the members of the Board of Immigration Appeals, have heavy caseloads. The same is true, however, of federal district judges, and we have never heard it argued that busy judges should be excused from having to deliver reasoned judgments because they are too busy to think. The two cases under review, like the other cases in which we have reversed the board of late, are not so difficult that it is unreasonable for a reviewing court to expect and require reasoned judgments at the administrative level. The errors that have compelled us to reverse in these cases despite the deferential standard of judicial review of agency action are not subtle. Asylum seekers should not bear the entire burden of adjudicative inadequacy at the administrative level.

The petitions for review are granted, the orders of removal vacated, and the cases returned to the immigration service for further proceedings consistent with this opinion. We urge that these two cases be reassigned to other immigration judges in view of the striking inadequacy of the analysis by the immigration judges whose decisions we are vacating. *Niam v. Ashcroft, supra*, 354 F.3d at 660-61; *Kerciku v. INS*, 314 F.3d 913, 919 (7th Cir. 2003) (per curiam); *Arulampalam v. Ashcroft*, 353 F.3d 679, 689-90 (9th Cir. 2003).

EVANS, *Circuit Judge*, concurring. Although I join the majority in voting to remand these two consolidated asylum petitions for further proceedings, I write separately to express my concern, and growing unease, with what I see as a recent trend by this court to be unnecessarily critical of the work product produced by immigration judges who have the unenviable duty of adjudicating these difficult cases in the first instance.

We are seeing a growing number of appeals in asylum cases every year. Just 4 years ago, in 2000, we resolved only 10 cases (in both published opinions and unpublished orders) involving appeals from orders denying asylum. We found substantial evidence supporting the decisions of the immigration judges (technically the BIA, but we can skip that detail) in 7 of these cases. In 2003 and the first 3 months of 2004, we have resolved 51 appeals in asylum cases. With today's consolidated cases, we will have vacated and remanded 7 of these cases in a row. The countries for which the petitioners in the 51 cases have sought asylum read like the parade of nations in the opening ceremonies for the Olympic games:

| | |
|---|---|
| Albania | Montenegro |
| Algeria | Nigeria |
| Bangladesh | Pakistan |
| Bulgaria | Peru |
| Cameroon | Poland |
| Columbia | Romania |
| Eritrea | Russia |
| Ethiopia | Rwanda |
| India | Sudan |

Kazakhstan        Thailand

Lebanon            Uganda

Macedonia        Ukraine

Mexico

Recently, in failing to find substantial evidence in the record sufficient to affirm the decisions of the immigration judges, we have made disparaging comments about the quality of their work:

- The immigration judge "took over the questioning so that in the end the judge, rather than the attorney, had elicited whatever testimony [the petitioner] was able to give."

- The immigration judge "made up his mind about the case and was subsequently unwilling to listen . . . ."

- "There is a gaping hole in the reasoning of the . . . immigration judge."

- These cases show "a pattern of serious misapplications by the . . . immigration judges of elementary principles of adjudication."

- The immigration judge's "analysis was so inadequate as to raise questions of adjudicative competence."

- The immigration judge "ignored the evidence."

- The immigration judge's analysis of the evidence "was woefully inadequate."

- The immigration judge displayed an "astounding lapse of logic."

- The immigration judge's opinion "is riven with errors . . . ."

I wonder, after reading comments like this, if we have a fair appreciation of the work load and conditions under which immigration judges must work. For one thing, what we see is less than the tip of the iceberg of an immigration judge's work load. In the Seventh Circuit, only 6 immigration judges hear roughly 1,000 contested asylum cases a year. That's an average of 166 cases per judge per year. Some of these cases moot out (for instance, an applicant drops his request for asylum because he gets relief—that is, the right to stay in this country—on some other basis), and many end with a grant of relief. But we only see the cases where relief is denied which leaves, I suggest, the false impression that the immigration judges are simply denying asylum petitions willy-nilly.

Asylum cases nationally are on the rise. According to the Department of Homeland Security, 63,400 asylum cases were filed (covering 86,597 principals, spouses, and children) in 2002—a whopping 10,522 asylum applications alone have come from petitioners wanting to get away from the People's Republic of China. In addition to China, the 2002 asylum applications came for petitioners trying to avoid returning to 33 other Asian countries. The 2002 asylum petitioners also came from 36 European countries, 44 African countries, and 19 countries in Central and South America and the Caribbean.

Many of these applications are resolved (some are granted—I'm told 35 percent—while others are denied) by asylum officers. Only the unresolved cases reach the hearing rooms of immigration judges. And the number, as we have seen, is staggering.

Contested asylum hearings themselves are not the sedate, high-tech proceedings one often sees in the courtroom of a United States district judge. Immigration judges have no court reporters—they record the proceedings on 30-minute

cassette tapes which they themselves mark and flip over when one side of a tape is filled. Much of the testimony they hear comes through interpreters. Imagine conducting hearings involving asylum applicants from Kazakhstan, Bangladesh, Sri Lanka, Yemen, and Mauritania over a 2-week period when none of the petitioners have a meaning-ful grasp of English.

To win a grant of asylum, a petitioner must establish that he is unable or unwilling to return to his home country because of past persecution or a well-founded fear of future persecution on account of race, religion, nationality, mem-bership in a particular social group, or political opinion. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). Because 100 percent of asylum petitioners want to stay in this country, but less than 100 percent are entitled to asylum, an immigra-tion judge must be alert to the fact that some petitioners will embellish their claims to increase their chances of success. On the other hand, an immigration judge must be sensitive to the suffering and fears of petitioners who are genuinely entitled to asylum in this country. A healthy balance of sympathy and skepticism is a job requirement for a good immigration judge. Attaining that balance is what makes the job of an immigration judge, in my view, excruciatingly difficult.

All in all, considering the difficult cases they hear day in and day out, I am of the view that immigration judges do a fairly good job. Are they perfect? No. Should we expect their decisions to be airtight? No. Perfection, I think, is simply impossible given their heavy work load, lack of resources, and the complexities involved in the cases they hear. In our two cases today, the immigration judges (Cuevas in Guchshenkov and Smith in Dimitrov) give us oral opinions that when transcribed run 10 and 16 pages long, respectively. The decisions demonstrate, as far as I'm

concerned, that these judges have tried to discharge their responsibilities in a fair and professional manner. This court should not be so quick to criticize their efforts.

A true Copy:

    Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*