# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-1876

MAMADOU DIALLO

*Petitioner*,

v.

JOHN D. ASHCROFT,

*Respondent.*

———————

On Petition to Review an Order of the
Board of Immigration Appeals.
No. A76-672-318

———————

ARGUED JANUARY 13, 2004—DECIDED AUGUST 26, 2004

———————

Before BAUER, MANION, and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. Mamadou Diallo, a native citizen of Mauritania, requested that the Immigration and Naturalization Service (INS)[1] grant him asylum. The Agency refused, reasoning that Diallo had not been persecuted in Mauritania, did not have a well-founded fear of future persecution

———————

[1] Congress transferred the functions of the former INS to the Department of Homeland Security (DHS) on March 1, 2003. The transfer does not effect any legal issue in the case, and the DHS did not exist during any of the underlying administrative proceedings. To avoid confusion, however, we will refer to the former INS as the "Agency."

there, and had firmly resettled in Senegal prior to his arrival in the United States. Because the Agency (1) ignored its own regulations regarding the proper factors to consider in a firm resettlement analysis, (2) failed to make a credibility determination, and (3) failed to support its decision on fear of future prosecution with reasonable or substantial evidence, we must remand for further proceedings consistent with this opinion.

Diallo was born in Mauritania in 1958 and lived there for the first thirty-five years of his life. According to Diallo's testimony, in 1986 he joined the African Liberation Force of Mauritania (FLAM) an organization seeking to fight against slavery, torture, and discrimination in Mauritania. Diallo's brother, Saidou, was also a member of FLAM, and because of his leadership role in the organization, in approximately 1989 or 1990, he was arrested and imprisoned for six months. Through newspaper accounts, Diallo learned that Saidou had been tortured and eventually killed while in prison. Diallo himself was not a leader in the organization; he did not pass out political leaflets or brochures and did not speak at political rallies, but he did support the organization monetarily from the proceeds of his work as a merchant and did not hide his support for FLAM.

In approximately May 1993, uniformed police officers arrived at Diallo's house at night searching for a member of FLAM. They handcuffed him, searched his apartment, confiscated all of his documents, and took him to jail without the opportunity to appear before a judge or to be represented by a lawyer. For the six months that he remained in jail, he was forced to perform hard labor, cutting and hauling wood and digging holes. During one incident when he was working too slowly, a guard slashed his arm with a knife.

After six months, Diallo's captors released him and immediately placed him on a boat to Senegal with nothing but his Mauritanian national identification card. Diallo spent four years in Senegal "selling small things " and living with a

former acquaintance from Mauritania in a rented apartment. He attended church, but had no familial ties in Senegal. Although he had neither a work permit nor official permission to remain there, he was not bothered by the Senegalese government. Diallo left Senegal and traveled as a stowaway on a boat to Baltimore, Maryland where he arrived in June 1997. Two months later, he submitted his application for asylum, withholding of removal, and for protection under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment (CAT).[2] Diallo appeared for his scheduled asylum interview, but because his privately hired interpreter never arrived and Diallo could not participate in the interview, he was deemed to have failed to appear, he was charged with removal, and his asylum application was referred to an immigration judge pursuant to 8 C.F.R. § 1208.14(c)(1).

The written decision by the immigration judge failed to make any credibility determinations, but rather assumed that even if Diallo had testified credibly, he would not be entitled to relief from deportation. The immigration judge found that Diallo's detention and expulsion did not amount to persecution, that he did not meet his burden of demonstrating a well-founded fear of future persecution, and that he was ineligible for asylum in any case because he had firmly resettled in Senegal prior to arriving in the United States. Consequently, the immigration judge also found that Diallo had not met the higher burden of proof required for withholding of removal and for protection under CAT.[3]

---

[2]  Pursuant to 8 C.F.R. § 1208.3(b)(3), an application for asylum is also considered an application for withholding of removal.

[3]  On appeal, Diallo does not challenge the immigration judge's denial of his request for withholding of removal or his automatic application for relief under CAT. Those issues, therefore, have been waived. *See Vladimirova v. Ashcroft*, No. 03-1852, 2003 WL

(continued...)

Diallo appealed the immigration judge's decision to the Board of Immigration Appeals (BIA), which summarily affirmed the decision of the immigration judge, making it the decision of the agency for purposes of our appellate review. 8 C.F.R. § 1003.1 (e)(4); *Szczesny v. Ashcroft*, 358 F.3d 464, 465 (7th Cir. 2004). That decision held that the final blow to Diallo's asylum claim was that he had firmly resettled in Senegal prior to his arrival in the United States. "Firm resettlement," however, is an odd tool to use to strike the final blow to an asylum claim, since under the current statutory iteration of the doctrine of firm resettlement, an immigration court **must** deny asylum to any refugee if "the alien was firmly resettled in another country prior to arriving in the United States." 8 U.S.C. § 1158(b)(2)(A)(vi).[4] That being said, it seems the logical place to begin rather than end an assessment of whether a refugee is entitled to asylum in this country. If the doctrine of firm resettlement sounds the death knell on the asylum-seeker's claim, there is simply no need to continue on to determine whether an asylum-seeker was the victim of past persecution or has a well-founded fear of future persecution.

The question of how to determine whether a refugee has firmly resettled in another country prior to her arrival in

---

[3] (...continued)
23676865 at *7 (7th Cir. July 26, 2004).

[4] Prior to 1990, firm resettlement was but one factor that an immigration judge weighed in deciding whether to grant asylum. *See Abdille v. Ashcroft*, 242 F.3d 477, 483 n.4 (3d Cir. 2001) (reviewing the history of the firm resettlement bar to asylum claims). Consequently, the immigration judge's citation to *Matter of Soleimani*, 20 I.&N. Dec. 99 (BIA 1989) for the proposition that "firm resettlement in another country is a factor to be evaluated in determining whether asylum should be granted as a matter of discretion" is incorrect. Because firm resettlement is currently a mandatory bar to the grant of asylum, it is no longer merely "one factor" to be considered.

the United States appears to be an issue of first impression for this circuit. The only published Seventh Circuit opinion discussing firm resettlement was decided in 1954, long before the enactment of the current statute and agency rules on the subject. *See United States v. Rumsa*, 212 F.2d 927 (7th Cir. 1954). Although the statute mandating the denial of asylum for refugees who have firmly resettled (8 U.S.C. § 1158(b)(2)(A)(vi)) does not itself define "firm resettlement" or offer instruction on how firm resettlement should be determined, the agency regulations set forth in straightforward language how an immigration judge should proceed in making that determination. 8 C.F.R. § 208.15. The regulations provide that:

> [a]n alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, or some other form of permanent resettlement unless he or she establishes:
>
> > (a) That his or her entry into that country was a necessary consequence of his or her flight from persecution, that he or she remained in that country only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that country; or
> >
> > (b) That the conditions of his or her residence in that country were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled. In making his or her determination, the asylum officer or immigration judge shall consider the conditions under which other residents of the country live; the type of housing, whether permanent or temporary, made available to the refugee; the types and extent of employment available to the refugee; and the extent to which the refugee received permission to hold

> property and to enjoy other rights and privileges, such as travel documentation that includes a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

8 C.F.R. § 208.15. After the government meets its initial burden of demonstrating firm resettlement, the asylum-seeker may rebut the presumption by presenting evidence to the contrary. *Musssie v. INS*, 172 F.3d 329, 332 (4th Cir. 1999); *Cheo v. INS*, 162 F.3d 1227, 1229 (9th Cir. 1998); *Salazar v. Ashcroft*, 359 F.3d 45, 50 (1st Cir. 2004). For the refugee who has failed to rebut the presumption of firm resettlement, all hope is not lost. She may also demonstrate that she falls within one of the two exceptions to firm resettlement articulated in section (a) and (b) of the regulation. 8 C.F.R. § 208.15(a), (b).

The primary and initial consideration, therefore, is a simple one—whether or not the intermediary country has made some sort of offer of permanent resettlement. The regulations do allow the immigration judge to consider factors such as the length of time spent in the country, housing, and the type and extent of the refugee's employment, among others, but **only after** making a preliminary finding of a genuine offer *vel non* of permanent resettlement, and only then when the applicant seeks to demonstrate that she falls into one of the two exceptions. 8 C.F.R. § 208.15. *See Rife v. Ashcroft*, 374 F.3d 606, 610-11 (8th Cir. 2004); *Abdille*, 242 F.3d at 486.

As we noted earlier, see footnote 4, *supra*, this was not always the case. Prior to 1990, "firm resettlement" was just one of the factors to be considered in the Agency's exercise of discretion in granting asylum. *See Rosenberg v. Yee Chien Woo*, 402 U.S. 49, 56, 91 S. Ct. 1312, 28 L. Ed. 2d 592 (1971); *Abdille*, 242 F.3d at 483 n.4. Under a discretionary scheme, where firm resettlement is but one factor to consider in

granting or denying an asylum application, an adjudicator could consider factors such as the length of stay, ability to work, familial ties, economic conditions in the third country, and the like as other factors that militate for or against a grant of asylum. In 1990, however, the INS amended its regulations to make firm resettlement a mandatory bar to asylum. 8 C.F.R. § 208.14 (1990). Later, Congress codified the mandatory prohibition on grants of asylum to firmly resettled refugees when it passed the Illegal Immigration Reform and Illegal Immigrant Act of 1996. 8 U.S.C. § 1158(b)(2)(A)(vi). These new regulations "reoriented the central inquiry of firm resettlement to focus the adjudicator on the actual existence vel non of an offer of permanent resettlement." Robert D. Sloane, *An Offer of Firm Resettlement*, 36 Geo. Wash. Int'l L. Rev. 47, 57 (2004). Such a focus is consistent with the goals of asylum law. As the Third Circuit points out, "[a]bsent some government dispensation, an immigrant who surreptitiously enters a nation without its authorization cannot obtain official resident status no matter his length of stay, his intent, or the extent of the familial and economic conditions he develops. Citizenship or permanent residency cannot be gained by adverse possession." *Abdille*, 242 F.3d at 487.

Despite the metamorphosis in the focus of firm resettlement inquiries, some circuits continue to hang on to the "totality of the circumstances" test, looking at the applicant's length of stay and social and economic ties in the third country either instead of or on par with governmental offers of permanent resettlement. *See, e.g., Mussie*, 172 F.3d at 331-32, *Cheo*, 162 F.3d at 1229. The Third and Eighth Circuits' obedience to the language and purpose of the regulation seems the more rational path, and for this reason we agree that the primary and most important inquiry in any analysis of firm resettlement is whether or not the stopover country has made some type of offer of permanent resettlement. *Abdille*, 242 F.3d at 480; *Rife*, 374 F.3d at 610-11.

We recognize, as did the Third Circuit, that "circumstances may arise in which the INS may not be able to secure direct evidence of a formal government offer of some type of permanent resettlement, and thus may be [sic] not be able to make the prima facie showing of firm resettlement under § 208.15 in that manner." *Abdille,* 242 F.3d at 486-87. In that case, the Third Circuit noted in dicta, the immigration judge or BIA "may find it necessary to rely on non-offer-based factors, such as the length of an alien's stay in a third country, the alien's intent to remain in the country, and the extent of the social and economic ties developed by the alien, as circumstantial evidence of a government-issued offer." *Id.* at 487. The Third Circuit sees these non-offer-based elements as surrogates for direct evidence of a formal offer only "if they rise to a sufficient level of clarity and force, which we need not delineate here." *Id.*

The immigration judge in Diallo's case, however, did not consider whether there was an offer at all. The immigration judge's determination that Diallo had permanently resettled in Senegal was based entirely on his two-sentence finding that: "prior to his arrival in the United States, [Diallo] resided in neighboring Senegal for four years. Indeed, the respondent worked as a merchant and lived with a friend and a family member." In short, the immigration judge relied on three factors in determining that Diallo had firmly resettled: (1) his four-year stay, (2) his work as a merchant, and (3) the fact that he shared an apartment with a friend and family member. Nothing suggests that the immigration judge was using these factors as indirect evidence of a formal offer. Rather, it seems clear that the immigration judge simply ignored the Agency's own regulations requiring the immigration judge to consider the existence *vel non* of an offer of permanent resettlement, and completely ignored Diallo's testimony that he had no such formal offer or permission to live or work in Senegal. (R. at 131, 137, 139).

The government argues that residency documents are not required in order for the government to establish firm resettlement, and cites *Cheo* for the proposition that the passage of time alone is enough to establish "some other type of permanent resettlement."[5] *Id.* 162 F.3d at 1229. But *Cheo* is not the case to turn to in order to alleviate our concern that the immigration judge failed to consider any evidence or lack thereof of an offer *vel non* of permanent resettlement. In fact, in *Cheo*, the Ninth Circuit considered the length of the stay only after concluding that there was no direct evidence one way or another as to whether the applicants had the right to return to the third country. *Id.* at 1229. In this way, its analysis was not much different from the Third Circuit's in *Abdille* when it announced that non-offer based elements may be used as surrogates for direct evidence only when there is no evidence of some formal offer of permanent resettlement. *Abdille*, 242 F.3d at 486-87. Neither the Ninth Circuit's approach in *Cheo* nor the Third Circuit's approach in *Abdille* allows an immigration judge to ignore completely the regulation's requirement to consider the existence of a formal offer or the lack thereof. The applicants in the *Cheo* case did not present any evidence of a lack of a formal offer. In this case, Diallo *has* presented evidence to the contrary. He presented undisputed testi-

---

[5] The government seems to be ignoring the language of the statute that requires an "offer" of "some form of permanent resettlement." 8 C.F.R. § 208.15. The word "offer" certainly implies some form of action on the part of the third country government. As the Third Circuit pointed out, citizenship or permanent residency cannot be gained by adverse possession—by surreptitiously entering a country and hiding from detection for many years. *Abdille*, 242 F.3d at 487. The "some other type of permanent resettlement" language, likely was added to account for the great variety in names and types of permanent offers of settlement in countries around the globe and was not meant to be a catch-all that would undue the requirement of a governmental "offer."

mony that he had no legal right to live or work in Senegal.[6] The immigration judge erred by failing to consider this evidence at all.

A finding of firm resettlement is a factual determination that must be upheld if it is supported "by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481, 112 S. Ct. 812, 117 L. Ed. 2d 38 (1992); *Krouchevski v. Ashcroft*, 344 F.3d 670, 673 (7th Cir. 2003). We reverse only if the evidence is such that a reasonable fact-finder would be compelled to reach an opposite conclusion. *Krouchevski*, 344 F.3d at 673. This "substantial evidence" review is highly deferential and does not allow this court to overturn an agency determination simply because we would have decided the case differently. *Capric*, 355 F.3d at 1086. Nevertheless, the immigration judge below failed to consider the single factor that agency regulations require him to consider. Had he done so he would be, as we are, compelled to find that Diallo had not firmly resettled in Senegal.

Even if the immigration judge were applying the now outdated "totality of the circumstances" analysis, his finding of firm resettlement still would not be supported by substantial evidence and the reasonable fact-finder would be compelled to make a finding to the contrary. Most significantly, the immigration judge erred by ignoring Diallo's testimony that he had no documents permitting him to live

---

[6] "The testimony of the applicant [for asylum], if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a). *See Kourski v. Ashcroft*, 355 F.3d 1038, 1039 (7th Cir. 2004), *Capric v. Ashcroft,* 355 F.3d 1075, 1085 (7th Cir. 2004), *Korniejew v. Ashcroft*, 371 F.3d 377, 382 (7th Cir. 2004), *Uwase v. Ashcroft*, 349 F.3d 1039, 1041 (7th Cir. 2003); *Georgis v. Ashcroft*, 328 F.3d 962, 969 (7th Cir. 2003). The immigration judge was simply wrong when he concluded that the Ninth Circuit's parallel holding did not apply in this Circuit. *See* (R. at 106-07).

or work in Senegal. An immigration judge may not simply ignore record evidence that favors the applicant's case. *See Vujisic v. INS*, 224 F.3d 578, 581 (7th Cir. 2000) (immigration judge and BIA erred by ignoring evidence of feared persecution and current conditions in applicant's native country). Diallo's testimony, if credible (and the immigration judge never found that it was not) was "sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a). *See* footnote 6, *supra*. Furthermore, in assessing Diallo's social and familial ties, the immigration judge found it significant that Diallo lived with a friend and family member while in Senegal. In the first instance, the immigration judge's factual determination was simply incorrect. While in Senegal, Diallo lived with a man he had met in Mauritania. The record firmly establishes that the men were not related. (R. at 131-32).[7] Moreover, we fail to see how living with a Mauritanian acquaintance in Senegal offers any evidence whatsoever of firm resettlement.

Consequently, we are left with a four-year stay and work as a "seller of small things"—the type of itinerant work that many refugees pick up in hopes of making ends meet until they reach their final destination. Four years does indeed constitute a lengthy stay, but not so lengthy that it, in and of itself, could support a finding of firm resettlement. The cases from our sister circuits—even those employing a "totality of the circumstances" test—have never held that a stay of this length in and of itself compels a finding of firm resettlement. The closest case comes from the Ninth Circuit's decision in *Cheo v. INS*, discussed earlier, which held

---

[7] Diallo initially appeared to testify that the man was related, but after a confusing exchange of questions and answers about how the man was related, the interpreter stopped the questioning to tell the judge that he did not know what the word "relative" meant. Once the confusion was remedied, Diallo testified clearly that the two men were not related. (R. at 131-32).

that a peaceful, undisturbed stay of three years in a third country was enough to "establish[ ] that the ground of 'firm resettlement' in [the third country] might apply" thus shifting the burden to the applicants to prove that they were not firmly resettled. *Id.* at 1229. The applicants in that case did not present any evidence to the contrary. Significantly, the Ninth Circuit considered the length of the stay only after concluding that there was no direct evidence one way or another as to whether the applicants had the right to return to the third country. *Id.* In this case, Diallo *has* presented evidence to the contrary. He presented undisputed testimony that he had no legal right to live or work in Senegal.

The other circuit court cases cited by the government in its brief (the immigration judge cited no cases other than the no-longer-valid decision of the BIA in *Matter of Soleimani*, 20 I.&N. Dec. 99 (BIA 1989)) are no more helpful in supporting the immigration judge's conclusion that Diallo had firmly resettled in Senegal, as all contained compelling evidence of firm resettlement other than the mere passage of time. *See Mussie*, 172 F.3d at 332 (petitioner lived in Germany for four years; German government gave petitioner asylum, travel documents, government assistance for transportation, food, rent and education; petitioner held a job, paid taxes and rented her own apartment)*; Vang v. INS*, 146 F.3d 1114, 1115 (9th Cir. 1998) (appellate court offered no details as to the factors the BIA applied in determining that petitioner was resettled, but in addition to living in France from the age of four to sixteen, applicant arrived in France as part of an official United Nations refugee program and also received French travel documents); *Yang v. INS*, 79 F.3d 932, 934 (9th Cir. 1996) (for purposes of the appeal, petitioners conceded that they were firmly resettled in France and argued only that the regulation on firm resettlement was beyond the authority of the INS; consequently the Yang Court had no opportunity to comment on

the factors that constituted the Yang's firm resettlement in France.); *Farbakhsh v. INS*, 20 F.3d 877, 880 (8th Cir. 1994) (petitioner lived in Spain for four years, intended to stay there as evidenced by his application for asylum, and had strong familial ties there); *Abdalla v. INS*, 43 F.3d 1397, 1399 (10th Cir. 1994) (petitioner lived in and possessed a residence visa/permit for the United Arab Emirates); *see also Rife*, 374 F.3d at 609, 611 (finding firm resettlement where Israeli government offered petitioners permanent re-settlement, issued certificates evidencing citizenship, and issued passports, none of which had ever been revoked); *Salazar v. Ashcroft*, 359 F.3d 45, 47-48 (1st Cir. 2004) (finding firm resettlement where petitioner lived in Venezuela for fourteen months, worked and rented an apartment, and received a Venezuelan passport with a resident stamp). In short, we cannot find a single published circuit court opinion that relied on as little as this immigration judge relied on to determine that an applicant for asylum had firmly resettled in a third country. We are compelled, therefore, to reverse the Agency's determination on firm resettlement.

Because we find that Diallo was not firmly resettled in Senegal, we can now turn to his claim that he is entitled to a grant of asylum. To qualify for refugee status in this country, a petitioner has the burden of demonstrating that she either has endured past persecution or has a well-founded fear of future persecution based on one of the statutorily protected categories. *See* 8 C.F.R. § 208.13(b); *Olowo v. Ashcroft*, 368 F.3d 692, 700-01 (7th Cir. 2004). An applicant who successfully establishes past persecution is presumed to have a well-founded fear of future persecution—a presumption that the Agency can rebut by demonstrating a change in circumstances or a reasonable ability on the applicant's part to relocate within the applicant's country. 8 C.F.R. § 208.13(b)(1); *Capric*, 355 F.3d at 1084. In the alternative, the applicant can establish a well-founded fear of future persecution if the fear is "subjectively genuine

and objectively reasonable in light of the credible evidence." *Capric*, 355 F.3d at 1084-85.

Although the statute does not define "persecution," this circuit has described it as "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *DeSouza v. INS*, 999 F.2d 1156, 1158 (7th Cir. 1993). It must be more than mere "harassment," and can include, "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, torture, behavior that threatens the same, and non-life-threatening behavior such as torture and economic deprivation if the resulting conditions are sufficiently severe." *Capric*, 355 F.3d at 1084 (internal citations omitted).

Were we reviewing Diallo's claim *de novo*, we might be inclined to find that, after facing six months unlawful imprisonment combined with hard labor, physical torture (recall that Diallo's arm was slashed when he failed to work as hard as was required), and expulsion from the country, Diallo was the victim of past persecution in Mauritania. After all, the immigration judge compared Diallo's case to three cases where this court had declined to find past persecution, but none of the factual scenarios in those cases came even close to the lengthy detention and physical hardship found in Diallo's case. In *Borca v. INS*, 77 F.3d 210, 213 (7th Cir. 1996), the petitioner was subject to an illegal search, was interrogated twice, and received threatening phone calls, but she never was imprisoned, forced to undergo hard labor, or physically tortured. This court upheld the immigration judge's finding that Borca was harassed and intimidated, but not persecuted. *Id.* at 215. Similarly, Barbara Skalak was jailed twice for interrogation, but each incarceration lasted for only three days—events that this court concluded were "mild persecution" falling short of the statutory criteria for "persecution" that triggers a grant of asylum. *Skalak v. INS*, 944 F.2d 364, 365 (7th Cir. 1991). And in the

third case, *Cuevas v. INS*, 43 F.3d 1167, 1170-71 (7th Cir. 1995), the petitioners were unable to make any connection between the threats made against them (and the death of their nephew and the stabbing of their son) and the armed wing of the communist party of the Philippines (NPA). Although they were involved in a bitter land dispute with squatters whom they believed to be acting on behalf of the NPA, there was no evidence that the squatters were acting on behalf of a governmental power, or even if they were, that the squatting amounted to persecution. *Id.* at 1171.

Other cases from this circuit support the view that Diallo's treatment did amount to past persecution. In *Asani v. INS*, 154 F.3d 719, 724 (7th Cir. 1998), we found a single detention in harsh conditions where the police beat the petitioner and knocked out his teeth sufficient to establish past persecution. And in *Vaduva v. INS*, 131 F.3d 689, 690 (7th Cir. 1997) we were convinced that the police had persecuted Mr. Vaduva when, during a single beating, they punched him in the face and broke his finger. Historically, short detentions or detentions without physical abuse seem to have been less apt to reach the "persecution" threshold required by this court. *See Dandan v. Ashcroft*, 339 F.3d 567, 573-74 (7th Cir. 2003) (one-time three-day detention with beatings and food deprivation does not compel a finding of past persecution)*; Zalega v. INS*, 916 F.2d 1257, 1260 (7th Cir.1990) (applicant was interrogated on several occasions, arrested, detained once for thirty-six hours, and had home searched and property confiscated, but was never beaten, tortured, or forced to perform hard labor).[8]

---

[8] We do not mean to imply that physical abuse and hardship is required in order to establish past persecution. A six-month detention may very well be sufficient in and of itself to establish past persecution. These cases demand an individualized assessment of all of the underlying facts of each applicant's claim.

Our review, however, is not *de novo*. Credibility determinations, findings of past persecution, and findings of a well-founded fear of future persecution are all factual determinations owed our strong deference. *Medhin v. Ashcroft*, 350 F.3d 685, 688-89 (7th Cir. 2003). Because we review the BIA's factual determinations under this highly deferential standard, we may not reverse a finding of no past persecution simply because we believe it was wrongly decided. Rather, we must be convinced that the evidence compels a decision contrary to the Board's. *Elias-Zacarias*, 502 U.S. at 481 n.1; *Dandan*, 339 F.3d at 572. It is a high standard to meet, and ordinarily we would be compelled to defer to the immigration judge's finding here. But the limits of our deferential standard of review are tested when we are asked to defer to findings of fact that the immigration judge has not made. In this case the immigration judge failed to make any credibility findings at all. Instead, the decision states, "even assuming that the respondent's claims are true," and then continues on to conclude that Diallo has not established that he suffered any past persecution. (R. at 43). In this case, however, the immigration judge's decision is so infected with doubts about Diallo's credibility that it is difficult to determine whether the immigration judge really did assume the truth of his claims.

There are many examples of the immigration judge's contradictory assessments regarding Diallo's credibility. For example, in the text the immigration judge noted that Diallo testified that his brother was arrested, tortured, and killed for being a leader of FLAM, but then he stated in a footnote, "[i]t befuddles the Court as to why the Mauritanian authorities would detain the respondent's brother, who was a 'leader,' in 1989, but not seek out the respondent until 1993." (R. at 42). After describing in the text how Diallo was "expelled" from Mauritania (the doubting quotation marks in original), the immigration judge noted that, "[t]he respondent, however, testified that he paid for transportation from Mauritania to Senegal." (R. at 42). Another footnote reads:

> The respondent did not provide any documentation of his Mauritanian citizenship until the date of the hearing. The Court also notes that the State Department has stated that judges should be wary of "Mauritanian" asylum applicants because nationals of other African countries, notably Senegal, are seeking to pass themselves off as Mauritanian because they feel their chances of obtaining asylum are greater. *See Asylum Profile* at 6. Moreover, the respondent was unable to produce any other document other than his identification card.

(R. at 43). Finally, the immigration judge noted, in a footnote, that "[i]t is peculiar that the respondent was 'expelled' in 1993, since all the relevant information shows that the mass exodus took place in 1989-1991." (*Id.*). The decision is so riddled with doubts regarding the veracity of Diallo's claim, that we cannot ascertain whether the immigration judge simply disbelieved all or some of Diallo's assertions or whether he actually assumed the truth of the testimony but nevertheless concluded that Diallo's six months of imprisonment, hard labor, physical torture, and expulsion did not amount to persecution.

This type of confusion over the immigration judge's credibility determination does not necessarily compel a conclusion that Diallo is entitled to asylum, but nevertheless warrants a remand to untangle the basis for the immigration judge's decision. *See Guchshenkov v. Ashcroft*, 366 F.3d 554, 559 (7th Cir. 2004) ("A remand is required because the immigration judge's analysis of their application is unreasoned. She 'determined that the respondent is basically credible; however, his testimony is not inherently persuasive.' We do not understand what this means."); *Muhur v. Ashcroft*, 355 F.3d 958, 961 (7th Cir. 2004) (failure to make a credibility determination regarding whether petitioner was or was not a Jehovah's Witness requires remand); *Niam v. Ashcroft*, 354 F.3d 652, 658 (7th Cir. 2004) (immigration judge's failure to make a credibility determination left a

"yawning void" in the decision); *see also Krastev v. INS*, 292 F.3d 1268, 1279 (10th Cir. 2002) ("we caution the BIA that its practice of simply assuming, without deciding, credibility is not favored"); *Cordon-Garcia v. INS*, 204 F.3d 985, 993 (9th Cir. 2000) (statements such as "even were we to assume that the respondent was a credible witness" do not allow the reviewing court to "undertake a meaningful analysis of Petitioner's credibility and its effect on her application for asylum").

The confusion created by the immigration judge's failure to make a credibility finding infected his analysis of Diallo's fear of future persecution as well. Recall that once an applicant proves past persecution, she creates a rebuttable presumption that she has a well-founded fear of future persecution. *Capric*, 355 F.3d at 1084. Even if an applicant cannot create a presumption of a well-founded fear of future persecution by affirmatively demonstrating past persecution, she can demonstrate a well-founded fear of persecution if the fear is subjectively genuine and objectively reasonable. *Id.* at 1085. The subjective fear component turns largely on the applicant's credibility and therefore a credibility determination is vital to an assessment of the applicant's well-founded fear of future persecution. *See id.*

Again, the immigration judge waffled back and forth on credibility, concluding on the one hand that "[t]he respondent has also not established that he was a member of FLAM, or what exactly FLAM has or has not done in Mauritania." (R. at 44). But then, stating,

> even assuming *arguendo* that the respondent has established that he is a member of the "opposition group," FLAM, the authorities allow many opposition groups and non-government organizations to publicly express views contrary to those held by the government.

(R. at 44) (citing the Bureau of Democracy, Human Rights and Labor, U.S. Dept. Of State, *Mauritania—Profile of*

*Asylum Claims & Country Conditions* ("Asylum Report")). Again, we simply cannot tell whether the immigration judge was crediting Diallo's claims or not. Because direct authentication or certification of an alien's testimony is difficult, if not impossible to find, the credibility analysis is vital to determining the validity of an applicant's claim. *See Capric*, 355 F.3d at 1085.

Our concerns are not limited to the credibility dodge. We have recently launched harsh criticism on immigration judges' over-reliance on State Department Asylum and Country Reports, noting the potential for bias in the reports and the inability of asylum-seekers to question the conclusions contained therein. *Niam*, 354 F.3d. at 658-69. In any case, the Asylum Report's conclusion that the authorities allow "many" opposition groups to publically disagree with the government is of no solace to Diallo if FLAM is not one of the "many" whose criticism is tolerated. The immigration judge's reference to this one inconclusive sentence of the Asylum Profile simply is not the type of reasoned analysis that is sufficient to support an administrative decision that Diallo does not have a well-founded fear of future persecution based on his political beliefs. *See Guchshenkov*, 366 F.3d at 560.

The other half of the immigration judge's decision on well-founded fear of future persecution dwells on the fate of those expelled from Mauritania during a period of ethnic cleansing. Diallo's claim, however, is that he was expelled based on his political beliefs (his support of FLAM) rather than on his race and ethnicity *per se*. Although it is true that Diallo also implies that he was expelled from Mauritania because of racism, we understand this to mean that he was expelled because the organization he supported—FLAM—supported the rights of the historically enslaved Black Moors in Mauritania. He may very well have been expelled because of his own race and ethnicity in addition to his membership in FLAM, but according to his own report, when the

officers came to his home in the middle of the night, confiscated his papers and hauled him to prison, they yelled at him "confirm[ing] that [Diallo] was a member of FLAM." (R. at 112). Consequently, the immigration judge's discussion of the fate of those Afro-Mauritanian expellees is not necessarily relevant to Diallo's case. Even if Diallo's claim were purely based on his Afro-Mauritanian ethnicity, as of the 1999 Country Report on which the immigration judge relied, only half of the 70,000 Afro-Mauritanians who had been expelled had been repatriated and the Mauritanian government still had not signed any repatriation agreements. (R. at 202). Likewise, according to the other State Department document on which the immigration judge relied, the 1999 Asylum Report, progress on repatriation was uneven and had stalled somewhat by late 1997. (R. at 182).

Whether Diallo has a well-founded fear of future persecution depends in large part on the credibility of his testimony. If indeed the police came looking for a "member of FLAM" when he was arrested and incarcerated, it seems most logical to focus on whether a member of a political opposition group such as FLAM can safely return to Mauritania today. We therefore remand for an assessment of Diallo's credibility and for an analysis of whether his fear is subjectively genuine and objectively reasonable in light of the credible evidence.

Finally, we address Diallo's claims that he was denied his Fifth Amendment right to due process rights in two different ways in the course of his immigration proceedings. We review claims of due process violations in removal proceedings *de novo. Kuschchak v. Ashcroft*, 366 F.3d 597, 602 (7th Cir. 2004). Diallo claims that his due process rights were violated when he was declared a "no show" at his asylum interview and the INS placed Diallo in removal proceedings and referred his application to an immigration judge. The government claims we have no jurisdiction to consider the actions taken by the asylum office. Diallo counters by claim-

ing that the matter was discussed at the hearing and became part of the record and therefore part of our review of the final BIA determination. We need not resolve this battle because we conclude that even if we had jurisdiction to consider the action, under Agency regulations, Diallo was required to demonstrate that his failure to appear—and a failure to provide an interpreter can indeed constitute a failure to appear—was the result of exceptional circumstances. *See* 8 C.F.R. § 208.10; 8 C.F.R. § 208.9(g). And although Diallo appeared with his lawyer at the interview, he failed to demonstrate affirmatively the existence of any exceptional circumstances. (R. at 161).

Finally, Diallo claims that the immigration judge's aggressive questioning and frequent interruptions denied him due process of law. After reviewing the hearing transcript, we can understand how Diallo found the judge to be impatient and, at times, inappropriate. Nevertheless, his behavior did not amount to a violation of due process. An immigration judge is permitted to "interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1). And although one hopes that an immigration judge will perform these tasks with patience and decorum befitting a person privileged with this position, such failures to do so do not in and of themselves create due process violations.

In sum, we reverse the finding of the Agency that Diallo was firmly resettled in Senegal and we remand to the Department of Homeland Security for a credibility determination and for subsequent proceedings to determine whether Diallo suffered past persecution or had a well-founded fear of future persecution entitling him to asylum in this country. In view of our criticism of the immigration judge in this matter, we urge the Department of Homeland Security to refer this case to a different immigration judge on remand.

REVERSED IN PART, REVERSED AND REMANDED IN PART.

No. 03-1876

**A true Copy:**

    **Teste:**

                    _____
                    *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*