In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 03-3020 & 04-1018

JOHN GOMES, JESSIE GOMES,
JONATHAN GOMES, and KEIRA GOMES,

*Petitioners,*

*v.*

ALBERTO R. GONZALES, Attorney General
of the United States of America,

*Respondent.*

On Petitions for Review of an Order
of the Board of Immigration Appeals.
Nos. A 29 840 664, A 70 582 368,
A 70 582 374 & A 70 657 632.

ARGUED JANUARY 17, 2006—DECIDED JANUARY 11, 2007

Before CUDAHY, POSNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Petitioners John Gomes, his wife
Jessie, and their two minor children, natives and citizens
of Bangladesh, are seeking asylum in this country be-
cause of severe mistreatment they received as Catholics
in the midst of that prominently Islamic country. First an
immigration judge (IJ), and then the Board of Immigration
Appeals (BIA), affirming without opinion, rejected their
application for asylum, withholding of removal, and
protection under the United Nations Convention Against
Torture (CAT). The first petition for review before this

court seeks relief from those rulings. In addition, the Gomes family unsuccessfully sought reconsideration and reopening of their case before the BIA. The second petition for review before us challenges that ruling. We have consolidated the two petitions for argument and decision. Because we conclude that the IJ did not adequately support his decision denying the Gomeses' application for asylum, we grant their petition for review and remand their case to the BIA for further proceedings consistent with this opinion.

# I

On December 10, 1990, Mr. Gomes entered the United States with a visitor visa. He was authorized to remain in the country until June 9, 1991, but he stayed well beyond that date. The rest of his family joined him on March 31, 1992, also entering with visitor visas. While living in the United States, the Gomeses had a third child, Kimberly, on April 1, 1996.

The government's brief indicates that some time in 1992, the Gomeses applied for political asylum with the former Immigration and Naturalization Service (INS), whose functions were largely taken over by the Department of Homeland Security in 2003. (Although this means that Mr. Gomes's application must have been filed more than one year after his arrival, the one-year time limit for such applications was added by Title VI of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Title VI, § 604(a), codified at 8 U.S.C. § 1158(a)(2)(B). It therefore did not apply to any of the Gomeses' petitions.) Because the Gomeses had overstayed their visitors' visas, the INS referred their asylum application to the immigration court and placed them in removal proceedings. They received their Notices to Appear before the immigration court on April 22, 2002.

At the removal hearing, the Gomeses admitted that they had stayed in the United States longer than their visas permitted and conceded that they were subject to removal. Mr. Gomes, however, sought relief in the form of asylum, withholding of removal, and protection under the CAT based on his claim that he and his family had been persecuted by Muslim extremists in Bangladesh because of their active involvement with the Roman Catholic church. At the hearing, Mr. Gomes testified that he was born into a staunchly Catholic family and had been both an active member of the Catholic community and a volunteer with a number of Christian organizations since the 1980s.

On April 10, 1990, while riding his motorcycle to a meeting at the Holy Cross Church in Bangladesh, he was struck from behind and rendered unconscious. He was seriously injured in the attack: his jaw was broken, he required twenty stitches in his head, his lips were stitched together, and he spent a little over a week in the hospital. As proof, Mr. Gomes submitted dental records that indicated that he had suffered permanent damage as a result of this attack, and he presented a certificate of discharge confirming when he was in the hospital. Since the attack, he testified, he has suffered from memory loss. When IJ O. John Brahos asked him how he knew that his attackers were Muslim fundamentalists, he replied that his neighbors, who were eyewitnesses to the attack, told him that four or five Muslim extremists pulled up in a car behind him and attacked him with what appeared to be an iron rod and a hockey stick. These witnesses identified Mr. Gomes's attackers as Muslim extremists based upon their dress. Again Mr. Gomes submitted corroborating evidence to the IJ, this time letters from witnesses who supported his account. Mr. Gomes indicated that Muslim fundamentalists in Bangladesh would "always try to stop [him] from preaching [his] religion." Prior to the

attack, he had received anonymous telephone calls at his job threatening that if he did not stop "doing what [he was] doing" he would be hurt. These callers also told him to "change [his] religion."

Matters did not improve after he was released from the hospital. On April 19, 1990, shortly after he returned home, Muslim fundamentalists broke down his door and ransacked his house. Again, he was able to identify the perpetrators as Muslim fundamentalists because of their dress. While in his home, the perpetrators set fire to his curtains, pushed him and his wife to the ground, and physically threatened him with a large knife. They took his television and other personal belongings. Before leaving they told him: "[N]ext time we'll come we'll kill you." "This is the last chance. Are you legal Christianity or you death [sic]?" Mr. Gomes reported both of these incidents to the police, but the police did not conduct any meaningful follow-up investigations. Mr. Gomes concluded his testimony by telling the IJ that he feared he would lose his life if he returned to Bangladesh.

Mrs. Gomes also testified at the removal hearing. She told the IJ that Muslim fundamentalists often harassed her. For example, on her way to work, Muslim extremists would stop her and question her about the whereabouts of her husband. Almost every night someone would throw stones at her window to scare her. She also testified that, shortly after Mr. Gomes came to the United States, her family members suffered persecution because they are Roman Catholics. Her brother and sister-in-law were attacked on their way home from a mass during Easter season by a group of Muslim extremists. During the attack, her brother was cut on his elbow and knee, and her sister-in-law was cut on the head. Her family members identified their attackers as Muslim fundamentalists because of their dress. Another brother was robbed by Muslim extremists while at work. Both his arm and his

tongue were sliced with a knife, and the robbers put a gun to his head. This incident was reported in a local newspaper, and the article was submitted to the IJ. Additionally, Mrs. Gomes testified that a more distant relative, who was an active Christian, was murdered in her home by Muslim fundamentalists after returning from a prayer meeting. This event also made the local papers, and a copy of the article was submitted to the IJ for the record.

In addition to this testimony, more than twenty documents were admitted into evidence documenting both the physical harm to Mr. Gomes and his family members and the persecution suffered by Christians in Bangladesh in general. These documents included a number of letters from various priests and heads of religious organizations corroborating Mr. Gomes's account of the attack on his person and the invasion of his home by Muslim fundamentalists. The record also included various newspaper reports of recent attacks on Christian institutions in Bangladesh, including an attack by Muslims on a Catholic girls' school in Dhaka, two separate bombing incidents (involving a church and a missionary school), and a terrorist attack against Christians. Finally, the record included the Department of State Annual Reports on International Religious Freedom in Bangladesh for 1999 and 2000 and the 1999 Country Report on Human Rights Practices in Bangladesh.

In a decision dated May 21, 2002, IJ Brahos denied the Gomeses' asylum application, finding that they had not established past persecution or a well-founded fear of future persecution as required under the statute. See INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). Based on his conclusion that the Gomeses did not qualify for asylum, the IJ also denied their request for withholding of removal and protection under the CAT. The judge did, however, grant them the privilege of voluntary departure. The

Gomeses appealed to the BIA, which affirmed the IJ's decision without opinion on July 22, 2003.

On August 21, 2003, the Gomeses filed a motion to reconsider. Shortly thereafter, they filed a motion to reopen the proceedings, in which they asserted that they had previously unavailable evidence supporting their claims for relief. In support of the motion, they submitted a June 2003 report from the International Christian Concern organization, which detailed more recent attacks against Christians in Bangladesh. In addition, they furnished more newspaper articles describing acts of violence against Christians, including an article that reported the stabbing death of a Christian evangelist and an article recounting the kidnapping of a "Gospel for Asia" missionary. They also submitted documents that reported on a religiously-motivated attack against other members of the Gomes family and on an attack of a Christian mission on Good Friday, April 18, 2003. In an affidavit accompanying the motion to reopen, Mr. Gomes added that he feared that his two daughters would be subjected to female genital mutilation if forced to return to Bangladesh.

The BIA denied both of these motions on December 22, 2003. In denying the motion to reconsider, the BIA opined that the Gomeses were just rehashing arguments that it had already considered when it originally affirmed the IJ's decision. With respect to the motion to reopen, the BIA ruled that the evidence was cumulative, given that the administrative record already contained evidence describing similar acts of violence against Christians in Bangladesh. The BIA also found that the Gomeses had failed to explain how this new evidence would change the result in their case. Finally, the BIA rejected the female genital mutilation argument, because it had not been raised earlier at the removal hearing.

As they were required to do, the Gomeses filed separate petitions for review from the BIA's denial of their petitions on the merits and its denial of their motions to reopen and reconsider. Because the BIA affirmed the IJ's decision without opinion, we review the IJ's decision directly. See, *e.g.*, *Sosnovskaia v. Gonzales*, 421 F.3d 589, 592 (7th Cir. 2005).

## II

Our review is, of course, deferential. We must affirm the IJ's decision if it is supported by reasonable, substantial, and probative evidence. *INS v. Elias-Zacarias,* 502 U.S. 478, 481 (1992); *Mansour v. INS*, 230 F.3d 902, 905 (7th Cir. 2000); *Mitev v. INS,* 67 F.3d 1325, 1330 (7th Cir. 1995). Under the statute, "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." INA § 242(b)(4)(B), 8 U.S.C. § 1252(b)(4)(B). The BIA's decision to grant or deny a motion to reconsider or a motion to reopen is reviewed for abuse of discretion. *Dandan v. Ashcroft*, 339 F.3d 567, 575 (7th Cir. 2003). In considering the Gomeses' petition for review, our role is not to conduct a *de novo* inquiry into the merits of the case. See *Gonzales v. Thomas,* 126 S.Ct. 1613, 1615 (2006); *INS v. Ventura,* 537 U.S. 12, 16 (2002). We may, however, remand a case to the agency for additional explanation or investigation, if the BIA (or the IJ, in a case like this one that was affirmed without opinion) has not adequately explained its result and it seems possible to us that the agency might be compelled to reach the opposite conclusion depending how it evaluates the record after remand. See *Thomas,* 126 S.Ct. at 1615; *Ventura,* 537 U.S. at 16.

In their petition for review, the Gomeses argue that the IJ erred in denying Mr. Gomes's application for asylum. Section 208(b)(1)(A) of the INA, 8 U.S.C. § 1158(b)(1)(A),

empowers either the Attorney General or the Secretary of Homeland Security to grant asylum to aliens who qualify as refugees. See, *e.g.*, *Koval v. Gonzales*, 418 F.3d 798, 804 (7th Cir. 2005). A "refugee" is "any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A) (2005); see also *Zheng v. Gonzales*, 409 F.3d 804, 808 (7th Cir. 2005). An applicant for asylum bears the burden of proving by a preponderance of the evidence that she qualifies as a "refugee" as defined by the statute. *Sosnovskaia*, 421 F.3d at 593 (citing 8 C.F.R. § 208.13(a)).

"[A]n applicant who is determined to have suffered past persecution is presumed to have a well-founded fear of future persecution," *id.* at 593, and a "rebuttable presumption arises in favor of granting asylum." *Angoucheva v. INS*, 106 F.3d 781, 788 (7th Cir. 1997). In order to rebut this presumption, the government bears the burden of proving, again by a preponderance of the evidence, that there has either been "a fundamental change in circumstances" in the applicant's country such that the applicant's fear of future persecution is no longer well-founded or that the applicant "could avoid future persecution by relocati[ng] to another part of the country." *Sosnovskaia*, 421 F.3d at 593 (quoting 8 C.F.R. § 208.13(b)(1)(i)(B); *Bace v. Ashcroft*, 352 F.3d 1133, 1140 (7th Cir. 2003)). The INA does not specifically define "persecution," but we have described it, without contradiction from the BIA, as "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate. . . . As we have also indicated, persecution means more than harassment and may include such actions as detention, arrest, interrogation, prosecution,

imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture." *Toptchev v. INS,* 295 F.3d 714, 720 (7th Cir. 2002) (all internal quotation marks and citations deleted). See also *Mitev*, 67 F.3d at 1330.

In determining that Mr. Gomes had not shown past persecution in Bangladesh, the IJ did not make any credibility determinations. Instead, he said that "even assuming that the respondent's claims are true, the harassment the respondent endured by Muslim fundamentalists, without more, simply does not rise to the level of past persecution as contemplated under the Act." He did not, however, give any reason for that conclusion, or for why the events that Mr. Gomes described failed to meet the definition of persecution. His attackers (whose deeds the police ignored) repeatedly proclaimed that they were targeting Mr. Gomes because of his religion and they were trying to force him to abandon Christianity for Islam. As we wrote in *Kantoni v. Gonzales*, "A credible threat that causes a person to abandon lawful political or religious associations or beliefs is persecution. *Bucur v. INS*, 109 F.3d 399, 405 (7th Cir. 1997) ("it is virtually the definition of religious persecution that the votaries of a religion are forbidden to practice it"); *Krotova v. Gonzales*, 416 F.3d 1080, 1086-87 (9th Cir. 2005); *Mamouzian v. Ashcroft*, 390 F.3d 1129, 1137 n. 6 (9th Cir. 2004)." 461 F.3d 894, 898 (7th Cir. 2006).

In reading the IJ's decision, we cannot tell what definition of persecution he was using or how he was applying it to Mr. Gomes's case. We recognize, of course, that at some point a line must be drawn between "harassment" and "persecution," and it is for the agency to draw that line. Nor is there any question about the fact that the conduct in question "must rise above the level of mere harassment to constitute persecution," *Asani v. INS*, 154 F.3d 719, 723 (7th Cir. 1998). Nonetheless, the agency has never expressed disapproval of the definition of

persecution we have been following, and so it is appropriate for us to use it in our assessment of the IJ's opinion. From that point of view, there can be no doubt that Mr. Gomes described far more than general harassment, which he endured because he was a Catholic. We have described this testimony already, and it tells a tale of severe physical abuse and terrorism inside his home, when his curtains were set on fire as Muslim fundamentalists held a knife to his throat and confiscated his property. See, *e.g.*, *Capric v. Ashcroft*, 355 F.3d 1075, 1084 (7th Cir. 2004) (noting that persecution can include "confiscation of property, surveillance, beatings, torture, [and] behavior that threatens the same. . ." (citations omitted)). The Bangladeshi government was responsible for this persecution, according to the testimony the IJ was willing to credit, because the police were either condoning these attacks or were unable to prevent them. See *Guchshenkov v. Ashcroft,* 366 F.3d 554, 557 (7th Cir. 2004), citing *Bace,* 352 F.3d at 1138-39.

According to Mr. Gomes, he was harshly beaten on one occasion. There is no requirement, naturally, that a person must endure repeated beatings and physical torment in order to establish past persecution. Although "multiple incidents create a more compelling case for finding persecution" the number of times that an applicant has been subjected to physical abuse "is merely one variable in the analysis of the whole of the petitioner's claim of past persecution." *Dandan*, 339 F.3d at 573. In *Vaduva v. INS*, 131 F.3d 689, 690 (7th Cir. 1997), for example, this court noted that a single beating in which strangers punched the petitioner in the face and broke his finger was sufficient evidence of past persecution. In *Asani*, we remanded a case to the BIA to determine whether a detention that involved a single beating in which the petitioner's two front teeth were knocked out constituted past persecution. 154 F.3d at 722-23. Although "broken bones are [not] the

*sine qua non* of persecution. . . these specifics indicate the severity of the beating and support its claim to be considered persecution." *Dandan*, 339 F.3d at 574.

Another problem with the IJ's opinion, given the fact that he was (apparently) crediting all of Mr. Gomes's testimony, was his conclusory statement that there was no clear evidence that Mr. Gomes or his family had been targeted *because of* their religious beliefs. We cannot see how one could come to that conclusion on this record. In fact, there is a great deal of evidence that supports the Gomeses' claims that they were targeted because of their religious beliefs. First, there is Mr. Gomes's testimony that anonymous callers threatened his life and demanded that he "change [his] religion." Mr. Gomes also told the IJ that when the Muslim fundamentalists broke into his home they gave him an ultimatum: either he could renounce Christianity or he could choose death. The fact that the attacks on Gomes family members often took place en route to religious meetings is at least circumstantial evidence that they were religiously motivated. In addition, the record contains a number of letters from priests and the heads of other Christian organizations corroborating Mr. Gomes's account of his attack and opining that Mr. Gomes and his family had been singled out for persecution because of their active involvement with the Catholic church. The government suggests that the authors of these letters failed to explain adequately why they thought that these attacks were done for religious reasons, but a suggestion by appellate counsel cannot fill a gap in the administrative record. The IJ never mentioned these letters in his decision.

Mrs. Gomes supported the family's claim in her account of a number of events in which Muslim fundamentalists approached her about her husband and his activity in the Catholic community. She told the IJ about several

acts of violence against her own family. One occurred in 1991, when Muslim extremists attacked her brother and sister-in-law as they were leaving an Easter mass; another occurred some time around the hearing, when she received news from Bangladesh that her other brother had been attacked and robbed by Muslim extremists. Mrs. Gomes told the court that a relative had recently been murdered by Muslim extremists in Bangladesh after he left a prayer meeting. The newspaper article reporting this incident made specific reference to the fact that the victim was a "Christian." All of this evidence supports the Gomeses' claims that these events were not random acts of violence, but religiously-motivated attacks.

Perhaps most problematic is the weight that the government apparently places on the fact that Mr. Gomes did not see the people who attacked him. But, as Mr. Gomes testified, he was attacked from behind and struck unconscious, making it virtually impossible for him to furnish a physical description of his attackers. Mr. Gomes offered instead accounts from eyewitnesses who were able to see the perpetrators. Once again, the IJ makes no mention of this supporting evidence in his decision. As we have noted before, "It is well-established that the credible testimony of an alien, without more, may be sufficient to sustain an asylum claim." *Korniejew v. Ashcroft*, 371 F.3d 377, 382 (7th Cir. 2004); see also *Ikama-Obambi v. Gonzales*, 470 F.3d 720, 725 (7th Cir. 2006). Mr. Gomes's credible testimony, coupled with these corroborating accounts, certainly looks like enough. Without any explanation from the IJ that takes these materials into account, we have no idea why the IJ ruled as he did.

Even if the IJ's determination that Mr. Gomes failed to prove past persecution is wrong, if the judge reasonably found that there was no risk of future persecution, we would deny the petition for review. In order to estab-

lish a well-founded fear of future persecution, "an alien must not only show that his or her fear is genuine but must establish that a reasonable person in the alien's circumstance would fear persecution." *Asani*, 154 F.3d at 725. A petitioner can meet the objective component "through the production of specific documentary evidence or by credible persuasive testimony," while the subjective component "turns largely upon the applicant's own testimony and credibility." *Balogun v. Ashcroft*, 374 F.3d 492, 499 (7th Cir. 2004).

In finding that Mr. Gomes did not establish a well-founded fear of future persecution, the IJ first recognized that, according to the State Department's 2000 International Religious Freedom Report for Bangladesh, "in recent years, cases of violence directed against minority communities . . . have resulted in the loss of lives and property." The IJ also took note of the report's statement that "[p]olice, who generally are ineffective in upholding law and order, often are slow to assist in such cases." Despite this evidence, the IJ announced that the documents in the record did not provide convincing evidence that Christians in Bangladesh are or have been persecuted. In this connection, he mentioned the State Department's 1998 Asylum Profile, which stated that "the minority religious communities 'Christians and Buddhist' have generally been able to live and worship with relatively few difficulties." According to the IJ's reading of this report, religious minorities live in Bangladesh with "a minimum of difficulty," and whenever isolated instances of violence against religious minorities break out, "the government moved quickly to contain these outbreaks." Additionally, the report stated that "Islamic fundamentalism is not an important force in Bangladesh."

Our major concern with the IJ's decision with respect to the Gomeses' likelihood of future persecution is his exclusive reliance on the State Department reports,

without factoring in other evidence in the record. In a number of decisions, we have addressed the immigration court's "chronic overreliance" on such reports. *Niam*, 354 F.3d at 658; see also *Bace*, 352 F.3d at 1139 ("[I]t would be improper to find that a witness's testimony about specific events could be contradicted by a generalized State Department report broadly discussing conditions in the applicant's country of origin."); *Galina v. INS*, 213 F.3d 955, 959 (7th Cir. 2000) ("[T]he [State Department] reports are brief and general, and may fail to identify specific, perhaps local, dangers to particular, perhaps obscure, individuals."). In fact, we have expressed a "healthy skepticism" of these reports. *Begzatowski v. INS*, 278 F.3d 665, 672 (7th Cir. 2002) (noting that the BIA should treat State Department reports "with a healthy skepticism, rather than, as is its tendency, as Holy Writ"); see also *Niam*, 354 F.3d at 658 ("The State Department naturally is reluctant to level harsh criticisms against regimes with which the United States has friendly relations.").

Evidence in the record apart from the Gomeses' own testimony—specifically a letter from a parish priest in Bangladesh—indicates that "Catholics in the country are being intimidated, harassed, threatened, killed, and their personal properties destroyed by . . . Muslim extremists." The IJ does not even mention this highly adverse evidence, as he concludes that Bangladesh is a safe place for Christians.

In fact, the State Department Reports themselves do not paint such a sunny picture of life for Catholics in Bangladesh. The 2000 Annual Report on International Religious Freedom indicates that there has been violence directed toward religious minority communities and that the police are often ineffective at dealing with such incidents. In addition, the Report notes that "[t]he Government responded quickly, but ineffectively, after an April 1998 attack on a Catholic school in Dhaka," an incident

that the IJ ignored, even though Mr. Gomes's lawyer mentioned it at the hearing. A translation of a Bangladeshi newspaper article in the record detailing this attack quotes a foreign official as remarking that "Christians have no business in the country [Bangladesh] and should take-off [sic] to where they belong America, England, and/or even Italy [sic]." The IJ had the obligation to explain why he chose to credit selected portions of certain State Department reports over other parts, and why he apparently gave the favored parts of the reports more weight than the accounts of individuals who actually live in Bangladesh.

As we have already noted, in order to reverse a finding of past persecution or a well-founded fear of future persecution "we must be convinced that the evidence compels a decision contrary to the Board's." *Diallo v. Ashcroft*, 381 F.3d 687, 698 (7th Cir. 2004). In order to earn this degree of deference, however, "the IJ must announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Sosnovskaia*, 421 F.3d at 592 (internal quotations omitted). In this case, the IJ's efforts fell short. We cannot defer to "findings of fact that the immigration judge has not made." *Diallo*, 381 F.3d at 698. The omissions and shortcomings in the IJ's decision that we have described leave us no choice but to remand for further proceedings. See *Iao v. Gonzales*, 400 F.3d 530, 534 (7th Cir. 2005).

**III**

The Gomeses also challenge the IJ's decision denying them withholding of removal and protection under the CAT. The standard for both of these forms of relief is more stringent than that for asylum. In order to succeed on a withholding of removal claim, an applicant must establish "a clear probability" that she will suffer persecution if

she returns to her home country. *Nigussie v. Ashcroft*, 383 F.3d 531, 534 (7th Cir. 2004). For CAT protection, the Gomeses must show that "it is more likely than not that [they] would be tortured if removed to [Bangladesh]." *Id.,* citing 8 C.F.R. §§ 1208.16(c)(2).

Because the IJ's decisions with respect to the withholding of removal and CAT claims were based on his view that the Gomeses had not satisfied their burden of establishing that they qualified for asylum and we are granting their petition for review with respect to that question, it is unnecessary for us to say much more about these claims. On remand, the immigration court should review them in light of its reconsideration of the administrative record. Similarly, because we find that the IJ's decision was not supported with adequate reasoning and are remanding this case to the immigration court for further consideration, it is unnecessary for us to determine whether the BIA abused its discretion in denying the motions to reopen and to reconsider.

### IV

We GRANT the Gomeses' petition for review from the decision of the BIA rejecting their claims for asylum and associated relief and REMAND for further proceedings consistent with this opinion.

A true Copy:

  Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—1-11-07