NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 27, 2009
Decided March 20, 2009

**Before**

RICHARD A. POSNER, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 08-3059

| | |
|---|---|
| JADRANKO TOMAS, et al., | Petition for Review of an Order of the |
| *Petitioners*, | Board of Immigration Appeals. |
| | |
| *v.* | Nos. A28 211 284, A98 730 970, |
| | A98 730 971 |
| ERIC H. HOLDER, JR., Attorney General | |
| of the United States, | |
| *Respondent.* | |

## O R D E R

Jadranko Tomas, a Serbian Christian and citizen of Bosnia-Herzegovina, applied—with his wife and child as derivative beneficiaries—for asylum, withholding of removal, and protection under the Convention Against Torture.  Tomas claims that he was persecuted on account of political opinion by the local police and members of a Serbian-nationalist crime ring.  The immigration judge ("IJ") denied the applications and the Board of Immigration Appeals ("Board") affirmed.  Because the IJ's conclusions are not supported by substantial evidence, we grant the petition for review and remand the case for further proceedings.

## Background

Before coming to the United States, Tomas lived in Prijedor, a town in northwest Bosnia-Herzegovina with a majority Serbian population. Beginning in April 2001, he operated a nightclub, at which he welcomed patrons from the town's various ethnic groups. Tomas testified that most of his clients were Croats and Muslims, and he saw no reason not to serve them; he is a businessman, not a nationalist, he said, and any client "was equally a good client." This business approach, however, was rare; according to Tomas, his was the only club in town that admitted patrons on a non-discriminatory basis. Tomas testified that business went smoothly for the first year, and the club quickly became Prijedor's most popular night spot.

Tomas's troubles began in May 2002 when the Milakovics, a local organized-crime family, took an interest in the club. The Milakovics owned nightclubs and brothels in Prijedor, and engaged in prostitution, human trafficking, and racketeering. The family patriarch, Milorad Milakovic, is well-documented as a notorious slave trafficker, and Tomas testified that he exercised "control of the whole city including judiciary, police and legislation."

Tomas's history with the Milakovics dated back to the Bosnian War. According to Tomas, Milorad's son Sasa was a right-hand man to the notorious Serbian paramilitary leader Željko Ražnatović (widely known as "Arkan"), and Sasa forcibly conscripted Tomas into the Serbian militia in February 1992. But Tomas refused to bear arms because he thought the war was "fratricidal and meaningless," and so was forced to perform manual labor along with imprisoned Muslims, Croats, and other Serbs who refused to fight. Tomas was so opposed to the war that he eventually defected and escaped to Serbia, where he remained for approximately a year and a half, waiting for the fighting to end.

In May 2002, Tomas testified, thirteen masked policemen raided his nightclub, searched the patrons, and forced them all to leave, costing him significant profits. At the time, he said, he believed the police were legitimately searching for someone or something. But the next day, three large men came to the nightclub on behalf of Sasa Milakovic to offer "protection" from future police raids, causing Tomas to believe that the previous night's raid was staged by Sasa Milakovic.

Nevertheless, Tomas declined to hire Sasa Milakovic's goons for "protection," so the following weekend, they returned and trashed the nightclub. When Tomas reported this to the police, the superintendent told him that they were "powerless to do anything" because Milorad Milakovic was one of the most influential people in Prijedor, and advised Tomas

that it was in his best interest to concede to the Milakovics' demands. Tomas finally conceded a month later, in June 2002, after the men had slashed his tires and trashed his bar again; he hired two of them as "security guards," work for which he was forced to pay five times the regular rate. Tomas testified that the Milakovics then became regulars at the club, and would drink, break glasses, and leave without paying. One night, he said, Sasa Milakovic's intoxicated brother opened fire at the ceiling, but when Tomas called the police, they "entered, stood there for a few minutes, and left" without investigating.

Tomas testified that in October 2002, Sasa Milakovic called him and demanded that he double the amount Tomas was paying his "security guards." When Tomas said he could not afford it, Milakovic threatened to kill him. Later that night, police arrived at the nightclub, planted drugs on Tomas, and then arrested him for drug possession. They tied him to a chair, punched him, and called him derogatory names. They detained Tomas overnight, but then released him without explanation, reaffirming his belief that the police were in collusion with the Milakovics.

In February 2003, Tomas testified, five of Sasa Milakovic's men arrived at the club, kidnapped him, and brought him to what Tomas described as a "private prison" in the family's hotel/brothel. The men tied Tomas to a chair, beat him, and extinguished cigarettes on him. Sasa Milakovic eventually arrived, spat on Tomas, called him a "Serbian traitor," derided him for allowing Muslims and Croats into his nightclub, and told him that he would kill him "like all the other traitors who were on good terms with Muslims and Croats during the war." Milakovic demanded that Tomas pay him 30,000 Bosnian marks (the equivalent of about U.S. $20,000), threatening that if Tomas did not pay, he would kill him and harm his pregnant wife. Tomas paid the money but fled to Serbia several days later, leaving his manager in control of the nightclub. Tomas testified that before he left town, he anonymously reported the Milakovic family and the corruption of the Prijedor police to Stabilization Force ("SFOR"), a NATO-led multinational force tasked with upholding the Bosnian peace agreement.

Three months later, in May 2003, Milorad Milakovic was arrested and pleaded guilty to charges of organized crime, human trafficking, and prostitution. Other members of the family, including Sasa, were also charged but went into hiding and at the time of Tomas's removal hearing remained at large. Milorad Milakovic reportedly escaped from prison in August 2007 but it is unclear from the record whether he was ever caught.

Tomas testified that in January 2004, his manager called him in Serbia and informed him that Sasa Milakovic's right-hand man, Drago Tintor, had come to the club with a message: Milakovic knew that Tomas had reported him to SFOR, and threatened that he

would "never live" if he returned to Prijedor. The manager ran the club in Tomas's absence until October 2004, when Tintor forcibly took it over with the help of the local police. Tomas has not received any profits from the business since.

Tomas, his wife, and their daughter entered the United States on tourist visas in March 2004, and filed for asylum in February 2005, claiming that Tomas had been persecuted by the Milakovics and the local police because of his political opinion. The IJ denied the applications. He credited Tomas's testimony but found that the harms he suffered were not sufficiently severe to rise to the level of persecution. Further, because the Bosnian government is currently prosecuting the Milakovics for trafficking and other crimes, the IJ found that Tomas had not established that the alleged persecution was perpetrated by the government or forces it was unable or unwilling to control. And in any event, the IJ found, Tomas failed to establish that the alleged persecution was on account of political opinion. According to the IJ, opening up a business to all ethnic groups was not a political act. For the same reasons, the IJ found that Tomas does not have a well-founded fear of persecution. The Board agreed in a summary affirmance.

## Analysis

Where, as here, the Board summarily adopts the IJ's decision, we review the IJ's decision for substantial evidence and will overturn it only if the record compels such a result. *Haxhiu v. Mukasey*, 519 F.3d 685, 689-90 (7th Cir. 2008). To succeed on his asylum claim, Tomas was required to demonstrate that he is unable or unwilling to return to Bosnia-Herzegovina because of past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1101(a)(42)(A); *Bejko v. Gonzales*, 468 F.3d 482, 484 (7th Cir. 2006). Establishing past persecution entitles Tomas to a rebuttable presumption of a well-founded fear of future persecution. *Hernandez-Baena v. Gonzales*, 417 F.3d 720, 723 (7th Cir. 2005).

Persecution may include such actions as "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture." *Soumahoro v. Gonzales*, 415 F.3d 732, 737 (7th Cir. 2005). In determining whether the record compels a finding of past persecution, we do not evaluate the applicant's claims against a "generic checklist." *Irasoc v. Mukasey*, 522 F.3d 727, 730 (7th Cir. 2008). Rather, we consider the frequency and severity of the harm and, if multiple incidents of persecution are alleged, we evaluate whether the combined sequence of experiences rises to the level of persecution. *Id; Cecaj v. Gonzales*, 440 F.3d 897, 899 (7th Cir. 2006). "Mere harassment" is insufficient, but a person need not endure multiple beatings and physical torment to

establish persecution. *Gomes v. Gonzales*, 473 F.3d 746, 754 (7th Cir. 2007). And while threats are not persecution per se, they may qualify as persecution "in the most extreme circumstances, such as where they are of a most immediate or menacing nature," *Bejko*, 468 F.3d at 486, or where they cause the applicant to "abandon lawful political or religious associations or beliefs," *Gomes*, 473 F.3d at 753 (internal quotations omitted).

Tomas bases his past persecution claim on the following experiences: (1) financial harm, including lost profits, extortion payments, and an approximately $20,000 "fine" to Milakovic; (2) property damage at his nightclub; (3) the October 2002 false arrest and overnight detention during which police punched him and called him derogatory names; and (4) the February 2003 kidnapping at gunpoint by Milakovic's henchmen during which they beat him, spat on him, extinguished cigarettes on him, derided him for being a "Serbian traitor," and threatened to kill him and his pregnant wife.

In deciding whether Tomas suffered past persecution, the IJ evaluated each experience in turn and concluded that none rose to the level of persecution. We may assume, for the sake of argument, that in isolation none of Tomas's experiences rose to the level of persecution. But that is not the proper standard; we have repeatedly cautioned immigration judges against addressing incidents of persecution in isolation rather than considering their cumulative significance. *See Jiang v. Gonzales*, 485 F.3d 992, 997 (7th Cir. 2007); *Tchemkou v. Gonzales*, 495 F.3d 785, 790-91 (7th Cir. 2007); *Bejko*, 468 F.3d at 486; *Cecaj*, 440 F.3d at 899. According to testimony the IJ credited, Tomas suffered a campaign of intimidation and terror that intensified over a nine-month period until he so feared for his life and the safety of his pregnant wife that he abandoned his business and fled town. Because the IJ evaluated each incident in isolation instead of assessing whether Tomas's experiences cumulatively constitute past persecution, his conclusion is not supported by substantial evidence. *See Jiang*, 485 F.3d at 997 (reversing agency's finding of no persecution where IJ focused on one detention and minor beating but failed to consider petitioner's testimony about his entire sequence of experiences); *Gomes*, 473 F.3d at 754 (holding that evidence compelled finding of persecution where sequence of events included harassment, one serious beating, and a home invasion during which perpetrators set fire to the petitioner's curtains, pushed him and his wife to the ground, threatened him with a large knife, stole personal belongings, and threatened to kill him).

We are also troubled by the IJ's finding that Tomas failed to demonstrate that he was persecuted by the government of Bosnia-Herzegovina or forces it was unable or unwilling to control. *See Hor v. Gonzales*, 421 F.3d 497, 501-02 (7th Cir. 2005). The IJ concluded abruptly that Tomas's evidence "completely fails in meeting this burden of proof," but Tomas provided ample evidence of police complicity in Sasa Milakovic's actions.

According to testimony the IJ credited, police officers raided Tomas's club in May 2002, and planted drugs on and falsely arrested him in October 2002, both times acting under orders from Milakovic.  Further, the police superintendent *admitted* that he was powerless to help Tomas because Milorad Milakovic was one of the most influential men in town, and advised Tomas to concede to Sasa Milakovic's demands.  If this did not convince the IJ that the government was unable or unwilling to control the Milakovics, it is difficult to imagine what would.  *See Hor*, 421 F.3d at 499, 502 (holding that actions of terrorists could be attributed to government where authorities told petitioner they could not protect him and advised him to "be extra cautious and keep a low profile"); *Guchshenkov v. Ashcroft*, 366 F.3d 554, 557-58 (7th Cir. 2004) (holding that thug violence could be attributed to government where police responded to petitioner's complaint by saying, "We have more important things to take care of"); *Andriasian v. INS*, 180 F.3d 1033, 1037, 1042-43 (9th Cir. 1999) (holding that persecution could be attributed to government where police responded to petitioner's assault complaint with indifference and advised him to "get out of [town]" if he wanted to save his family's lives).  Although the government of Bosnia-Herzegovina did eventually indict the Milakovics and many of their subordinates for human trafficking, this belated prosecution on wholly unrelated charges does not cure the government's past complicity in Tomas's persecution.  *See Agbor v. Gonzales*, 487 F.3d 499, 504 (7th Cir. 2007) ("We do not think that as soon as a government pledges to end a persecutory practice, the individuals still suffering from the vestiges of that practice automatically cease to be entitled to protection.").

We turn next to the IJ's conclusion that Tomas did not establish persecution on account of a protected ground.  *See* 8 U.S.C. § 1101(a)(42)(A).  According to the IJ, "Yes, the extortionists were Serbian nationalists who didn't like the fact that [Tomas] operated a business for everyone, but that does not come close to establishing persecution on account of a political opinion."  But in reaching this conclusion, the IJ completely overlooked the doctrines of mixed motives and imputed political opinion.  Although it is clear that Milakovic's actions were partially motivated by the prospect of economic gain, this did not preclude Tomas from establishing eligibility for asylum; persecutors often have multiple motives, and an asylum applicant need demonstrate only that his persecutor was motivated *in part* by a protected ground.  *Gjerazi v. Gonzales*, 435 F.3d 800, 812 (7th Cir. 2006).

Tomas did admit that his decision to operate a non-discriminatory business was financial, not political (as he wrote in his asylum application, Muslims and Croats, who comprised half his clientele, were "normal paying customers like everyone else and a source of my income").  But even in the absence of an *actual* political opinion, Tomas needed to show only that Milakovic, rightly or wrongly, perceived him as a political opponent and harmed him, at least in part, for that reason.  *See Hamdan v. Mukasey*, 528 F.3d 986, 992 (7th

Cir. 2008); *Nakibuka v. Gonzales*, 421 F.3d 473, 478 (7th Cir. 2005).  The IJ completely ignored Tomas's testimony that Milakovic decried him as a "Serbian traitor" for letting Muslims and Croats into his nightclub, and threatened to kill him "like all the other traitors who were on good terms with Muslims and Croats during the war."  In light of Tomas's refusal to bear arms during the Bosnian War and his decision to operate the only non-discriminatory nightclub in Prijedor in spite of the ongoing ethnic tension there, these comments reflect that Milakovic attributed to Tomas an anti-nationalist political stance and was motivated at least in part by that attributed opinion.  Because the IJ ignored the possibility that Milakovic was partly motivated by an imputed political opinion, he failed to provide a "well-reasoned, documented, and complete analysis that engages the evidence," and his conclusions therefore are not supported by substantial evidence.  *See Gjerazi*, 435 F.3d at 813; *see also Mohideen v. Gonzales*, 416 F.3d 567, 571 (7th Cir. 2005) (remanding where Board ignored evidence supporting mixed-motive aspect of petitioner's claim).

Once an asylum applicant establishes past persecution, the burden shifts to the government to establish that the applicant lacks a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1); *Cecaj*, 440 F.3d at 900.  The IJ concluded that, because the government of Bosnia-Herzegovina is prosecuting the Milakovics, Tomas does not have a well-founded fear of persecution.  In so concluding, the IJ ignored evidence that Sasa Milakovic had evaded the Bosnian authorities and had continued to issue death threats against Tomas while on the lam.  But, in any event, the IJ placed the burden on the wrong party; because Tomas had established that he was persecuted in the past, it was the government's burden to establish that persecution is unlikely to recur if Tomas returns to Bosnia-Herzegovina. *See Balliu v. Gonzales*, 467 F.3d 609, 612 (7th Cir. 2006).

Accordingly, we GRANT the petition for review, VACATE the removal order, and REMAND for further proceedings consistent with this opinion.