# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 03-1393, 03-1394 & 03-1395

AHMED MAMEDOV, OQULSHEKER MAMEDOV,
and JANNET MAMEDOV,

*Petitioners*,

*v.*

JOHN ASHCROFT, Attorney General
of the United States,

*Respondent.*

_____

On Petitions for Review of an Order of
the Board of Immigration Appeals.
Nos. A 75 319 524–26.

_____

ARGUED OCTOBER 5, 2004—DECIDED NOVEMBER 1, 2004

_____

Before POSNER, KANNE, and WOOD, Circuit Judges.

POSNER, Circuit Judge. The Mamedov family was ordered removed after its claim for asylum was rejected. The family comes from Turkmenistan, one of the formerly Soviet republics in central Asia, like the better known Kazakhstan and Uzbekistan. The overwhelming majority of its people are Turkmens of the Muslim faith. Jews are distinctly un- popular, and only about a thousand remain. Ahmed

Mamedov's father was a Turkmen, presumably Muslim although this is not certain, but Mamedov's mother was Jewish and he was raised as a Jew. He claims that whenever an employer or coworker discovered that he was a Jew, he was fired, and likewise his wife because she is a Muslim married to a Jew and many Muslims disapprove strongly of mixed marriages. Cf. *Guchshenkov v. Ashcroft*, 366 F.3d 554, 556 (7th Cir. 2004); *Kuhai v. INS*, 199 F.3d 909, 910 (7th Cir. 1999). He also claims to have been beaten by police officers because of his being Jewish. At their asylum hearing the Mamedovs submitted affidavits from seven refugees from Turkmenistan who are in mixed marriages and who have been granted asylum in the U.S. The affidavits describe firings and beatings. One of the seven, a former schoolmate of Mamedov named Feriants, stated that he was "personally familiar with the fact that Ahmed is Jewish and that this created a very substantial problem for him in Turkmenistan." The record contains a corroborating affidavit from a political science professor.

As in a number of recent cases, the opinion by the immigration judge, whose denial of asylum the Board of Immigration Appeals affirmed without issuing its own opinion, is unreasoned. See, e.g., *Yu-Ti Lian v. Ashcroft*, 379 F.3d 457, 459 (7th Cir. 2004); *Guchshenkov v. Ashcroft*, *supra*, 366 F.3d at 559; *Niam v. Ashcroft*, 354 F.3d 652, 654 (7th Cir. 2004). But here we note a further problem that we had not heretofore been aware of. Immigration judges characteristically issue oral rather than written opinions—that we knew and while it is not an ideal practice, it is common enough even among federal district judges and we do not wish to suggest that it is irregular. The wrinkle is that no copy, either paper or electronic, of the opinion is given to either the parties or the immigration judge until and unless the alien files a notice of appeal to the Board of Immigration Appeals. The copy of the opinion that appears in the appendix to the

petitioner's brief in this court contains handwritten corrections, evidently by the judge. The copy is not dated. The notice of appeal had to be and was filed within 30 days of the rendition of the immigration judge's oral opinion and order, but we do not know how long after that the judge edited the opinion. Most of his changes are purely technical, but where the transcribed opinion states that "it is unclear that the attack [by the police on Mamedov] was based solely on the fact that the respondent's mother possessed a Jewish nationality," the immigration judge wrote in, after "solely," "or in [sic] even partially."

That was a substantive change, and there is no indication that the immigration judge was merely recalling a passage from his oral opinion that had somehow not been transcribed. Rewriting an already issued opinion when the author later discovers that there is going to be an appeal invites criticism similar to that leveled against the use of *nunc pro tunc* orders to rewrite history. See, e.g., *Central Laborers' Pension, Welfare & Annuity Funds v. Griffee*, 198 F.3d 642, 644 (7th Cir. 1999); *Kusay v. United States*, 62 F.3d 192, 193 (7th Cir. 1995); *Transamerica Ins. Co. v. South*, 975 F.2d 321, 325 (7th Cir. 1992); *Sierra Club v. Whitman*, 285 F.3d 63, 67 (D.C. Cir. 2002). In the case of appeals from district courts to courts of appeals, although the district judge can correct a clerical error at any time, Fed. R. Civ. P. 60(a), he cannot alter his judgment after the notice of appeal is filed, because the notice transfers the case from the district court's jurisdiction to that of the court of appeals. *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (per curiam). The immigration service has no similar rule; and amending an opinion after the appeal is taken is not the same as amending the judgment, but in general it is a bad practice for a judge to continue working on his opinion after the case has entered the appellate process, except in emergency situations requiring the issuance of the judgment in advance of the prepara-

tion of the opinion. The practice presents the losing party with a moving target. A regulation of the immigration service requires the immigration judge to "review the transcript [of his oral decision] and approve the decision" only if a "transcription of an oral decision is required," 8 C.F.R. § 1003.5(a), which would ordinarily be only if an appeal is taken. But the regulation does not indicate whether changes to the opinion, beyond merely the correction of typographical and grammatical or other technical errors, are appropriate.

Reviewing and evaluating the evidence, the immigration judge stated that Mamedov's internal passport identified him as a Turkmen rather than a Jew but that he "considered himself Jewish because that was his mother's nationality." Jewishness is not a nationality, but an ethnicity and a religion, and Mamedov practiced Judaism. This is important because if the only respect in which Mamedov is Jewish is that his mother was (and of course the name he goes by is his father's Turkmen name, not a recognizably Jewish name), it might as the immigration judge thought be unlikely that Mamedov's coworkers and employers would know that he was Jewish.

The immigration judge noted that Mamedov "testified that someone at his place of employment saw him leaving a synagogue and then when he was asked about this, he could not deny his mother's nationality or that he was Jewish." The judge did not quite say that he didn't believe that Mamedov had attended a Jewish religious service, though he seemed skeptical; instead he noted that Mamedov admitted "that there were no synagogues in Ashgabat [the capital of and largest city in Turkmenistan, where he lived], that there was no practicing rabbi's [*sic*], and that what he meant to say [was] that there was a meeting he attended in someone's apartment." Since "he only bumped into his coworker on the street . . . how would this coworker know that

[Mamedov] was attending a religious meeting in someone's private apartment." However, there is no evidence that the (informal) synagogue was in an apartment; the word Mamedov used was "house" (or at least that was the translation—Mamedov testified in Russian). Nor is there any evidence that Mamedov merely "bumped into his coworker on the street." Mamedov's testimony was that people knew that the house was a meeting place for Jews and that the coworker saw him there (presumably saw him enter or leave) and drew the obvious conclusion.

The immigration judge also was mistaken when he rejected Feriants's affidavit on the ground that the affidavit "indicates . . . that {Mamedov] suffered harm, was fired from a job, was unable to maintain regular employment, was unable to rely on the protection from the police, and experienced personal and substantial injuries at the hands of people in Ashgebat who hated Jews," when "obviously, Lev Feriants would not be aware of any of these facts [since] he last saw the [Mamedovs] in the 1980's in Turkmenistan." But the only purpose for which the affidavit was offered was to prove that Mamedov was Jewish, something the immigration judge may have doubted (he referred for example to Mamedov's "imputed religion or his nationality"). When Feriants said that Mamedov's religion "created a very substantial problem for him in Turkmenistan" he was drawing the obvious inference from his own experience and that of the other refugees.

There are other strange gaps in the immigration judge's opinion, as when it states that Mamedov "claims that the attackers asked [him] his name, [but] this does not seem reasonable given the fact that they never said anything else to him, and proceeded to attack him." We cannot begin to understand the basis for such a judgment. And what was the immigration judge thinking when he said that "if, in this

case, [Mamedov's] father was a Turkmen and [Mamedov] also was considered a Turkmen by nationality, it appears that discrimination that [Mamedov] received in the past was not as significant as he claims"? If Mamedov's coworkers, employers, and the police knew he was Jewish by religion and hated him for it, how would his or his father's nationality make discrimination against him on account of his religion less "significant"? It's like saying that a Jew in Nazi Germany was okay as long as he was of German nationality.

The judge thought Mamedov's testimony undermined by the fact that background materials that he submitted estimated that there are 1000 Jews in Turkmenistan, most of them in Ashgebat, but that at the hearing he testified that there are only five or ten Jews in Ashgebat. The judge misunderstood his testimony. When Mamedov said "around 10 people, 8 to 10 people" he was referring to the size of the Jewish congregation, for he went on to say that "we had a pretty small place."

The immigration judge said that even if all the evidence presented by the petitioners were believed, they had not demonstrated either that they had been persecuted or that they would be persecuted if they were sent back to their country of origin. The judge gave no reason for this alternative holding, however, and the case is not so clear cut that the omission can be overlooked. Being excluded from *all* employment (as opposed to discriminatory exclusion from some jobs), and being beaten by the police to boot, could amount to persecution. *Borca v. INS*, 77 F.3d 210, 215-17 (7th Cir. 1996); *Baballah v. Ashcroft*, 367 F.3d 1067, 1075 (9th Cir. 2004).

For these reasons, the Board's order is set aside and the case remanded.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*