**File Name: 08a0195n.06**
**Filed: April 14, 2008**

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

**No. 07-3499**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| FLAMOR DJOKOVIC, | ) | |
| | ) | |
| Petitioner, | ) | ON PETITION FOR REVIEW |
| | ) | OF AN ORDER OF THE |
| v. | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| MICHAEL B. MUKASEY, | ) | |
| | ) | |
| Respondent. | ) | |

Before:       BOGGS, Chief Judge; ROGERS, Circuit Judge; and SHADUR, District Judge[*]

BOGGS, Chief Judge.  Flamor Djokovic was a citizen of the former Federal Republic of

Yugoslavia[1] when he entered the United States without inspection and thereafter requested asylum

and withholding of removal from the Immigration and Nationalization Service ("INS").[2]  The INS

---

[*]  The Honorable Milton I. Shadur,  United States District Judge of the Northern District of Illinois, sitting by designation.

[1]Djokovic was born in Tuzi, Montenegro, which at the time of his birth was part of the Federal Republic of Yugoslavia.  In 2003,Yugoslavia was formally abolished and Montenegro became part of an entity called "Serbia and Montenegro."  On June 3, 2006, this entity was also formally abolished when Montenegro declared its independence.  Serbia and Montenegro are now two independent countries.

[2]  In 2002, the INS was abolished by the Homeland Security Act, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002), and its functions were transferred to various agencies within the Department of Homeland Security ("DHS").  The Immigration Court and the Board of Immigration Appeals remain part of the Department of Justice.  We refer to INS when discussing actions it took

No. 07-3499
Djokovic v. Mukasey

referred his application to the Immigration Court, where it was reviewed and denied by Immigration

Judge ("IJ") Marsha K. Nettles. The IJ ordered him to be removed to Serbia and Montenegro.

Djokovic appealed to the Board of Immigration Appeals ("BIA"), which adopted and affirmed the

IJ's decision. Djokovic now petitions this court for review, arguing that: (1) he was denied due

process when he was given only an uncorrected, unsigned version of the IJ's decision prior to the

BIA proceedings instead of the corrected copy that was included in the BIA's administrative record

when Djokovic petitioned this court for review; and (2) the underlying decisions of the IJ and BIA

were erroneous.

We hold that though it was extremely poor practice not to provide the parties with the

corrected version of the IJ's decision when it was corrected, Djokovic's right to due process was not

violated because the discrepancies between the versions were neither significant nor central to the

BIA's affirmance of the IJ's judgment.

We also affirm the BIA's denial of Djokovic's claims for asylum, withholding of removal,

and protection under the Convention Against Torture ("CAT"). Though we do not endorse the IJ's

findings regarding Djokovic's credibility and whether his experiences amounted to past persecution,

we affirm the IJ and BIA on the grounds of changed country conditions.

I

---

during its existence and to DHS for activities after the INS's abolition.

No. 07-3499
Djokovic v. Mukasey

Djokovic is an ethnic Albanian who was born on January 2, 1985, in Tuzi, Montenegro. He first entered the United States on September 9, 1999, at the age of fourteen. On March 8, 2000, Djokovic submitted his first Application for Asylum and Withholding of Removal ("initial application") under the Immigration and Nationality Act ("the Act"), 8 U.S.C. § 1101. At the time, Djokovic was not fluent in English and relied on an interpreter provided by a community organization–the Albanian Assistance Center in Bronx, New York.

After various procedural hearings, including a change of venue from New York to Detroit, and the passage of several years, an IJ conducted a hearing on August 30, 2005, to investigate the merits of Djovokic's asylum application. Djovokic was represented by counsel and the proceedings were conducted in English, Djokovic having learned the language in the six years since his arrival in America. Prior to the hearing, Djokovic had submitted a supplemental or updated application for asylum and withholding under both the Asylum Act and the CAT. In addition to the initial and supplemental applications, Djokovic also entered several documents into evidence, including a certificate from the Kosova[3] Liberation Army ("KLA") stating that Djovokic's father had been actively involved in "support to Kosova Refugees." Several articles and reports on the background of Yugoslavia, Serbia, and Montenegro were also admitted.

---

[3] Most English-language sources spell the country "Kosovo", which is also the Serbian spelling. The Albanian spelling is "Kosova" or occasionally "Kosovë". A rose by any other name might smell as sweet, but a country by any other name is a highly political issue. Given the country's recent declaration of independence, we find it more appropriate to adopt the spelling preferred by the government of the new country. Accordingly we use "Kosova" unless quoting from another source.

Because we narrowly affirm the IJ and BIA decisions on the grounds of changed country conditions, we describe the crux of Djokovic's claim only in brief. Djokovic claims that he and his family have been persecuted for their political and social activities, specifically for assisting ethnic Albanians in Montenegro and providing safe passage to Albania for refugees from Kosova. Djokovic also suggested that his father was involved in supplying arms to the KLA, but he was not certain of that.

The event that precipitated Djovokic's flight from Montenegro occurred on the evening of June 6, 1999. According to Djokovic, he was at his uncle's house watching a soccer match. Djokovic's father had been away from their home for an unspecified amount of time, helping families from Kosova get into Albania. Djokovic claims that late in the evening, a group of armed men wearing military clothing broke down the door of the uncle's house and arrested and beat both Djokovic and his uncle. They demanded to know the whereabouts of Djokovic's father, and when neither Djokovic or his uncle provided any information, the two were taken to a military prison. During the ride, the armed men alternately taunted and beat Djokovic and his uncle, mocking the situation of ethnic Albanians. At the military prison, Djokovic and his uncle were separated and placed in small, windowless, lightless cells. Djokovic was left alone for several hours. Eventually three men came into the cell, interrogated him, and beat him with their hands, feet, and police batons. Djokovic was left alone again for several hours before being released. Though he was not beaten again, the guards insinuated that something worse would happen if Djokovic's father did not turn himself in. After the June 6, 1999 incident, Djokovic did not leave the house, not even to attend school. Four to six weeks later, Djokovic's family decided to smuggle him out of the country

because they feared for his safety. He was smuggled into Albania where he stayed for a few months awaiting an opportunity to come to the United States. A family friend found a youth soccer team that was traveling to Canada and was willing to pass Djokovic off as one of their players. In Canada, Djokovic met a separate set of smugglers who got him into the United States.

Djokovic testified to these facts at the hearing. While he demonstrated fluency in English, it is also clear that he did not have a full mastery of the language and that he misunderstood the judge and DHS attorney at times and the judge and attorney also seemed to have misunderstood him. At the conclusion of the hearing, the IJ recessed for deliberations, though the record does not indicate the length of the recess. Upon reconvening, the IJ rendered an oral decision denying Djokovic's application and ordering him removed to Serbia- Montenegro. The IJ found that Djovokic was not credible and, in the alternative, that even if Djovokic were credible, the events that he described did not rise to the level of persecution. The IJ further found that even if such treatment were persecution, the country conditions have changed in Serbia-Montenegro, rebutting Djokovic's presumption of a well-founded fear of future persecution. Finally, the IJ found that Djokovic's past treatment did not rise to the level of severity that would justify granting asylum on humanitarian grounds. As a corollary, because Djokovic could not meet the burden for a grant of asylum, he also failed to meet the higher burden necessary for a grant of withholding.

As for Djovokic's claim for protection under the CAT, though the IJ made an independent assessment of Djovokic's credibility on this issue, she ultimately relied on many of the same inconsistencies discussed below in the context of Djovokic's asylum claim. The IJ further found that even if Djokovic had been credible, the conduct complained of did not rise to the level of torture as

defined in the CAT. Other than Djokovic's allegation of past torture, he presented no other substantial evidence to prove that he faced the possibility of torture should he be removed. Accordingly, the IJ denied Djokovic's application for withholding under the CAT and ordered him removed to Serbia-Montenegro.

The IJ initially rendered an oral decision. The uncorrected and unsigned transcription was included in the administrative record at pages 85-117. Later, though it is not clear when, the IJ made handwritten changes to the decision and signed it. This version was incorporated into the administrative record at pages 50-82.

Djokovic appealed the decision. The BIA affirmed the IJ's decision on March 29, 2007 in a one-paragraph opinion that summarily adopted the findings and reasoning of the IJ. *In re Djokovic*, No. A78 205 845 (B.I.A. March 29, 2007). The BIA did not state which version of the IJ's decision it reviewed. Following the BIA's decision, Djokovic appealed to this court. It was only upon receiving the record for this appeal that Djokovic discovered the two versions of the judgment.

**II**

"To prevail on a due process challenge to deportation proceedings, [an alien] must show error and substantial prejudice. A showing of prejudice is essentially a demonstration that the alleged violation affected the outcome of the proceedings; we will not simply presume prejudice." *Gishta v. Gonzales*, 404 F.3d 972, 979 (6th Cir. 2005) (quotation omitted). "The alien carries the burden of establishing that [he was] prejudiced . . . or denied . . . fundamental fairness in order to prove that he has suffered a denial of due process." *Allabani v. Gonzales*, 402 F.3d 668, 676 (6th Cir. 2005).

Djokovic concedes that "some of the changes are undoubtably grammatical or minor in nature," but argues that there are also, "many significant changes." Pet'r Br. at 15. Djokovic explicitly mentions four differences that he considers significant. The first difference involved the omission of the word "not" in the definition of torture, which reversed the meaning of the sentence. *Compare* J.A. 66 *with* J.A. 31. Nevertheless, it was obvious that "not" was omitted accidentally, and the intended meaning of the sentencing was clear given the context and the supporting citation. The second difference involved the substitution of the word "admissions" for "omissions" in a sentence explaining what facts can support an adverse credibility finding. *Compare* J.A. 31-32 *with* J.A. 68-69. While "admit" and "omit" obviously have different meanings, the substitution made little difference in practice given the surrounding context and given the accompanying citation, which referenced the language contained in the corrected copy.

The third and fourth differences are more troubling and illustrate the dangers in an oral opinion that is forwarded for review without an examination for errors in transcription: Both of these discrepancies arose because the IJ initially misquoted Djokovic's testimony and later corrected those quotes. In the first instance, the IJ misquoted Djokovic's testimony concerning the dates of his father's arrests. *Compare* J.A. 43 *with* J.A. 78. In the second instance, the IJ misquoted Djokovic's testimony in response to the question of whether he or his family had been involved in political organizations. *Compare* J.A. 36 *with* J.A. 71.

If the IJ had actually relied on the inaccurate quotations in making her adverse credibility findings, this court would be very troubled. However, that does not seem to be the case. The IJ's discussion of the alleged inconsistency as to the dates of the father's arrest took up the three pages

of the transcribed opinion and the IJ accurately quoted Djokovic's testimony twice in those pages, whereas she misquoted it only once. The IJ's discussion of the alleged inconsistency as to participation in political groups took up two pages. Despite the misquotation, one could easily glean the factual basis of and reasoning behind the IJ's adverse credibility finding on that matter. Of course, whether or not the IJ was actually correct in identifying inconsistencies and whether her reasoning was sound is a separate issue–but not one that matters for Djokovic's due process claims.

We recognize that "[i]n general, it is a bad practice for a judge to continue working on his opinion after the case has entered the appellate process, except in emergency situations requiring the issuance of the judgment in advance of the preparation of the opinion. The practice presents the losing party with a moving target." *Mamedov v. Ashcroft*, 387 F.3d 918, 920 (7th Cir. 2004). However, Djokovic has failed to explain how he was *prejudiced* by not having the corrected judgment.

On one hand, if the BIA relied on the uncorrected decision, which admittedly contained errors, Djokovic was not prejudiced because he had the opportunity to point out any mistakes to the BIA. On the other hand, if the BIA relied on the corrected version of the judgment, it is also hard to see how Djokovic was unfairly prejudiced by not receiving a copy. After all, Djokovic's brief to the BIA questioned only the underlying reasoning of the IJ and did not refer to any of the particular mistakes it now identifies in the uncorrected copy of the judgment. Obviously, if the changes to the judgment had been substantive–for example if the IJ added alternative grounds for her adverse credibility finding–then Djokovic would have cause for complaint. But that is not the case here. The corrected copy contained cosmetic changes fixing errors that Djokovic apparently did not deem

significant enough to mention in his brief to the BIA. Though this court deplores an administrative process that failed to provide the parties with corrected copies of the IJ's decision, it is clear that the outcome of the case (the BIA's affirmance of the IJ) would have been no different. Thus, Djokovic's due process claim is without merit.

## III

Where the BIA adopts an IJ's decision, we review the underlying decision as well as any additional reasons stated by the BIA. *Gilaj v. Gonzalez*, 408 F.3d 275, 282-83 (6th Cir. 2005). We review the legal conclusions of the IJ and BIA de novo. *Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004). Findings of fact, including determinations of credibility, however, are deemed "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." INA § 242(b)(4)(B), 8 U.S.C. § 1252(b)(4)(B).

### A. Refugee Asylum and Withholding of Removal

1. Eligibility

In order to be eligible for asylum, the applicant must demonstrate that: (1) he is a refugee as defined in 8 U.S.C. § 1101(a)(42)(A); and (2) he "merits a favorable exercise of discretion by the Attorney General." *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994). The applicant bears the burden of proof of demonstrating either past persecution or well-founded fear of future persecution. 8 C.F.R. § 208.13(a)-(b) (1997).

An applicant's testimony, if credible, can be, by itself, "sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a) (1997). An applicant who establishes past

persecution is presumed to have a well-founded fear of persecution. 8 C.F.R. § 208.13(b)(1)(i) (1997). The presumption may be rebutted by establishing by a preponderance of the evidence that since the persecution occurred, conditions in the applicant's country have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he were to return. *Ibid.*

2. Credibility and Past Persecution

Because we affirm the IJ's decision on the narrow grounds of changed country conditions, we need not formally review her adverse credibility finding or her finding that the alleged events did not arise to the level of persecution.

3. Changed country conditions

Whether country conditions have changed sufficiently to rebut the presumption of a well-founded fear is a finding of fact, which we review under the deferential abuse-of-discretion and substantial-evidence standards. An IJ's finding of changed country conditions is deemed "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." INA § 242(b)(4)(B), 8 U.S.C. § 1252(b)(4)(B).

As evidence of changed country conditions, DHS submitted the 1999, 2003, and 2004 Country Reports on Human Rights Practices in Serbia and Montenegro. Eight pages of the 1999 report detailed the conditions in Montenegro. There were some reports of abuses committed by the federal VJ (Yugoslavian Army) troops stationed in Montenegro, including abductions and detentions of Kosovar refugees and extrajudicial killings. U.S. Dep't of State, Country Reports on Human

Rights Practices for Serbia-Montenegro – 1999, 35-36 (Feb. 23, 2000) [hereinafter 1999 Report].

The 2003 and 2004 reports, however, demonstrated significant improvements in the conditions.

U.S. Dep't of State, Country Reports on Human Rights Practices for Serbia-Montenegro – 2003

(Feb. 25, 2004) [hereinafter 2003 Report]; U.S. Dep't of State, Country Reports on Human Rights

Practices for Serbia-Montenegro – 2004 (Feb. 28, 2005) [hereinafter 2004 Report].  For example

there were no reports of politically motivated killings or disappearances in 2003 or 2004.  2003

Report, 41 and 2004 Report, 34.   The 2003 and 2004 reports also noted that while there were still

reports of police occasionally beating suspects during arrest or detention, there were fewer reports

than in previous years.   2003 Report at 41 and 2004 Report at 34.   The sections on

"National/Racial/Ethnic Minorities" did not even mention the Albanian minority, but rather focused

the problems encountered by Romanis and Bosniaks.[4]  2003 Report at 48 and 2004 Report at 40-41.

The IJ noted the changed country conditions, citing the lack of politically motivated killings,

disappearances, or detentions.  J.A. 82.   The IJ also noted that many of the events that happened to

Djokovic and his family occurred under Slobodan Milosevic's regime and that Milosevic was no

longer in power.  Though the IJ based her finding primarily on the country reports, this does not

mean her decision was not supported by substantial evidence.  *Shasha v. Gonzales*, 227 F. App'x

436, 440 (6th Cir. 2007) ("This Court has consistently held that substantial evidence supports the

conclusion that country reports detailing the regime change in Iraq rebut any presumption of a

well-founded fear of persecution based on past persecution on account of Christianity."); *see also*

---

[4] "Bosnian" refers to citizens of Bosnia, regardless of ethnicity.  "Bosniak," however, is an ethnicity.

*Gojani v. Mukasey*, No. 06-3951, 2008 U.S. App. LEXIS 4229, *10 (6th Cir. Feb. 20, 2008) (upholding a finding of changed country conditions even though the IJ "relied principally on the State Department's Country Reports regarding the human rights situation in Kosovo."). The IJ's findings also comported with past precedent. *See,* e.g., *Micakovic v. Ashcroft*, 85 F. App'x 424, 425-426 (6th Cir. 2003) ("The IJ noted that, according to the State Department Country Report, ethnic Albanians were treated well in Montenegro, and concluded that [the applicant] should not fear returning there."); *Gjokic v. Ashcroft*, 104 F. App'x 501, 506 (6th Cir. 2004) ("According to the State Department, ethnic Albanians are treated relatively well in Montenegro, and the evidence thus does not compel an immigration judge to conclude that petitioners have a well-founded fear of returning there.").

Djokovic responded by citing several articles discussing the conditions in Serbia and Montenegro. But these articles did not adequately distinguish conditions in Serbia and conditions in Montenegro, the former being much worse for ethnic Albanians. Furthermore, much of the criticism contained in the reports was directed at the lack of investigation into *past* abuses, as opposed to new allegations of recent abuses. The Amnesty International Report acknowledged the same: "There appeared to be a drop in the number of alleged instances of torture or ill-treatment by the police in 2004. Amnesty International is concerned, however, that allegations continued and investigations into previous allegations of police torture and ill-treatment remained seriously flawed." Amnesty International, "Serbia and Montenegro: A Wasted Year. The Continuing Failure to Fulfill Key Human Rights Commitments Made to the Council of Europe," (March 22, 2005), available at http://www.amnesty.org/en/library. Furthermore, Djokovic did not submit any

individualized evidence that would tend to show that he would remain a target for persecution despite these changed country conditions. The immigration judge's finding that Djokovic did not have a well-founded fear of persecution based on the changed country conditions in Montenegro was thus supported by substantial evidence.

4. Withholding of Removal

In order to qualify for withholding of removal, Djokovic "must establish that there is a clear probability that he will be subject to persecution if forced to return to the country of removal." *Pilica v. Ashcroft,* 388 F.3d 941, 951 (6th Cir. 2004). This is a higher burden of proof than what is required for a claim of asylum. Because Djokovic could not establish his eligibility for asylum, it follows he could not "satisfy the more onerous burden for withholding of removal either." *Cutaj v. Gonzales*, 206 F. App'x 485, 492 (6th Cir. 2006).

**B. Asylum on humanitarian grounds**

Djokovic also applied for a humanitarian grant of asylum under 8 C.F.R. § 1208.13(b)(1)(iii). That provision applies to those applicants who have suffered past persecution, but whose presumption of a well-founded fear of persecution has been rebutted. In order to qualify, the applicant must either demonstrate "compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution" or "establish that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country." 8 C.F.R. § 208.13(b)(1)(iii)(A) and (B).

- 13 -

The IJ found that Djokovic was not eligible for a grant of asylum under this portion of the regulations because Djokovic suffered only "one detention of a brief confinement and an alleged beating that occurred during that brief confinement." The IJ also relied on *In re N-M-A*, 22 I&N Dec. 312 (BIA 1998), a case in which the BIA denied asylum to an applicant who was detained for a month, during which he was beaten periodically, deprived of food for three days, and ultimately hospitalized. The IJ emphasized that "the incidents [in Djokovic's case] nowhere rise to the level of the incidents that were se forth in *Matter of N-M-A*." *In re Djokovic*, File A 78 205 845, slip op. at 30 (U.S. Immigration Court, Aug. 30, 2005)(uncorrected decision).

Even taking into account Djokovic's young age, we cannot hold that the IJ abused her discretion in denying Djokovic's request for asylum on humanitarian grounds. Those seeking humanitarian asylum must have suffered past persecution that is "particularly severe." *Cutaj*, 206 F. App'x at 491(citing *Pergega-Gjonaj v. Gonzales*, 128 F. App'x 507, 512 (6th Cir. 2005)). We have, in numerous cases, rejected applications for asylum on humanitarian grounds when the maltreatment complained of is far more severe than that suffered by Djokovic. *See, e.g.*, *Pergega-Gjonaj* (four months of hard labor and starvation and atrocities committed against extended family members); *Potka v. Ashcroft*, 65 F. App'x 50, 51 (6th Cir. 2003) (applicant was forced to watch murdered mother's body being dragged through the streets). Assuming Djokovic's account of events to be true, the IJ did not abuse her discretion in holding that his experiences did not constitute particularly severe persecution and that Djokovic was accordingly ineligible for a humanitarian grant of asylum.

## C. Protection under the CAT

To be eligible for relief under the CAT, "an applicant must show that it is more likely than not that she will be tortured upon return to her country." *Hamida v. Gonzales*, 478 F.3d 734, 741 (6th Cir. 2007) (citing 8 C.F.R. § 208.16(c)(2)). "Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 1208.18(a)(2). Evidence of past torture inflicted upon the applicant is one of the factors used to evaluation whether it is more likely than not that an applicant would be tortured upon removal. The IJ rejected Djokovic's request for protection under the CAT on the grounds that: (1) Djokovic's statements concerning the alleged torture were not credible; and (2) even if they were, "the single incident of brief confinement and beating" did not rise to the level of torture as defined in the CAT. As we have already noted, the IJ's credibility assessment was flawed. Nevertheless, we affirm the IJ's conclusion. Even if Djokovic's testimony is taken as credible, the incident complained of did not constitute past torture and Djokovic introduced no other significant evidence to establish that it was more likely than not that he would be tortured if removed. The IJ's finding is supported by substantial evidence and we accordingly affirm.